**BIOMET, INC., Appellant–Plaintiff,**

v.

**BARNES & THORNBURG,**
**Appellee–Defendant.**

No. 02A05–0205–CV–197.

Court of Appeals of Indiana.

July 8, 2003.

Peter L. Obremskey, Kent M. Frandsen, Parr Richey Obremskey & Morton, Lebanon, IN, Attorneys for Appellant.

Forrest Bowman, Jr., Bowman Cosby & Bowman, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Biomet, Inc. appeals the trial court's grant of summary judgment in favor of Barnes & Thornburg (B & T) in an action for legal malpractice.[1] Biomet raises the following restated issues for review:

1. Did the trial court err in determining that the statute of limitations should not be tolled until the conclu-

sion of the patent infringement litigation brought by Pedro Ramos against Biomet?

2. Did Biomet, as a matter of law, release B & T for any alleged failure to properly represent Biomet's interest, including its disclosure to DePuy, Inc. (DePuy) of privileged communication with Biomet, by executing a joint representation agreement?

We reverse and remand.

The facts most favorable to Biomet, the nonmovant, are that on March 23, 1983, Niles Noblitt of Biomet met with Pedro Ramos, M.D., to discuss Ramos's Universal Hip Prosthesis. After the meeting with Ramos, Noblitt sent B & T patent attorney William Coffey drawings of a device manufactured by DePuy, another manufacturer of orthopedic devices and a competitor of Biomet, as well as Ramos's pending patent application and a letter. Noblitt's letter included the following:

> The device that DePuy introduced did undergo some modification by DePuy prior to its introduction and is not specifically like the device described by the inventor. The modifications do represent an improvement; we would undoubtedly want to make some such similar modification if we come to terms with the inventor.

*Appellant's Appendix, Vol. 2* at 146.

On April 19, 1983 Coffey sent Noblitt a letter stating that the proposed DePuy device might well infringe the Ramos patent if issued without modification. Coffey requested a full file history and all prior art references. On June 1, 1983, Coffey received from Noblitt a copy of the Ramos patent as issued. On June 23, 1983, Cof-

---

1. Oral argument was heard in this cause on May 12, 2003, in Indianapolis. We commend both parties for the quality of their preparation and presentations.

fey sent Noblitt an opinion that the DePuy device did not infringe the Ramos patent as issued. The opinion noted that it was based on a study of the patent and study of the drawings provided by Biomet of the DePuy prosthesis. The opinion included the following:

The claims which issued in the Ramos patent are significantly narrower in their scope of coverage than the claims presented in the original application. The features of the Ramos device. Since we have not seen the file history of the patent, we do not know why the claims were narrowed; but in the likely event that it was in response to a rejection on the prior art, Ramos will not be allowed to interpret the claims broadly enough to recover any of the subject matter that was given up. Putting it another way, the added structural features would be explicitly limiting, and DePuy would not infringe claim 1 when interpreted in this way.

Our study has been limited to the DePuy device, pending finalization of the design of the proposed Biomet device. If the latter differs in any significant way from DePuy's, further study will be required, in addition to the projected examination of the Ramos file history.

*Appellant's Appendix, Vol. 2* at 193–94. Coffey also recommended that a patent search be conducted for prostheses which are similar to the DePuy and Ramos devices if Biomet went forward with a design. On July 7, 1983, Noblitt sent Coffey a letter stating they had decided on a bipolar cup design. He also stated his doubt that a further patent search was necessary.

Anthony Fleming, a design engineer, came to work for Biomet in July 1983 and was asked to design a bi-polar device by September 1983. He first designed one similar to a drawing he had been given.

That design was not accepted. He then designed a device that went into production and sale by Biomet in the fall of 1983.

On February 9, 1990, Biomet was sued for patent infringement by Ramos in federal district court in Florida (the Ramos litigation). The suit alleged, among other things, that Biomet was infringing Ramos's United States Patent No. 4,380,090 by the manufacture and sale of its Bi-Polar Hip System.

Ramos had also filed, at the same time, another lawsuit raising similar claims against DePuy. A decision was made that B & T would defend both Biomet and DePuy against the Ramos claims. On August 14, 1990, an agreement was entered into between Biomet, DePuy, and B & T setting forth some of the considerations, terms, and effects of the joint defense (the Agreement). In the Agreement, the parties acknowledged and waived some of the conflicts of interest inherent with a joint defense and arranged for the sharing of defense costs. Both Biomet and DePuy consented to B & T's release to the other of certain confidential information that would otherwise be protected by the attorney-client privilege as deemed necessary for B & T to properly defend both parties in the Ramos litigation.

On July 13, 1990, after the Ramos suit was filed, Bobby Gillenwater of B & T sent a letter to Daniel Hann, General Counsel of Biomet, expressing the opinion that the Biomet device did not infringe the Ramos patent. Prior to the conclusion of the trial, B & T made a decision not to offer into evidence either the July 13, 1990 opinion letter or the opinions sought and obtained from B & T during the development of its prosthesis, prior to the commencement of the Ramos litigation. B & T also did not offer into evidence the background design drawings prepared by Biomet personnel

two years prior to seeing the Ramos device.

B & T's defense of Biomet in the Ramos litigation was technical in nature, claiming that Biomet's prosthesis did not infringe the Ramos patent. Further, B & T alleged that by waiting nearly seven years to bring suit after becoming aware of the alleged infringement, Ramos was guilty of laches that precluded his right to recover. After a two-week bench trial, the trial court found that 1) Biomet's manufacture and sale of its prosthesis infringed the Ramos patent, 2) the infringement was willful because the Biomet prosthesis was inspired by Ramos's invention, and Biomet had not taken the required step of obtaining a sound opinion of competent patent counsel as a basis for any good faith belief in non-infringement, and 3) Biomet's failure to obtain a sound opinion of counsel and have a good faith belief in the validity of its actions constituted unclean hands which barred it from obtaining the effects of any equitable defenses such as laches, even though Ramos had waited nearly seven years after becoming aware of Biomet's alleged infringement before bringing suit. Ramos was awarded compensatory damages of nearly $2 million, which by statute was trebled to nearly $6 million in light of the willfulness finding.

Biomet received notice in August 1993 of the district court's judgment in favor of Ramos. Biomet conferred with B & T about the prospects for appeal of that judgment. B & T attorneys assured Biomet that the district court had committed substantial errors in its decision and there was a substantial likelihood that B & T would be successful in having the entire judgment overturned on appeal to the United States Court of Appeals for the Federal Circuit (Federal Circuit). Based on B & T's assurances and Biomet's belief that it would have been impractical and contrary to Biomet's chances of success on appeal to do otherwise, Biomet authorized B & T to continue its representation in the appeal of that judgment.

On appeal of the judgment to the Federal Circuit, a three-judge panel affirmed the judgment of infringement, but reversed the finding of willful infringement. The appellate court noted that the infringement was not a literal one and that Biomet had sufficiently attempted to design around the Ramos device to shield it from a finding of willfulness. The Federal Circuit did, however, affirm the district court's rejection of the defense of laches based on two independent grounds:

> The district court held that Biomet did not carry its burden of persuasion in demonstrating that the affirmative defense of laches applied in this case. We review the district court's decision of this issue for abuse of discretion. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032, 22 USPQ2d 1321, 1328 (Fed.Cir.1992) *(en banc)*.

> To invoke the laches defense, the defendant has the burden of proving that the plaintiff delayed for an unreasonable length of time in filing suit and that the delay caused prejudice or injury to the defendant. *Aukerman*, 960 F.2d at 1032, 22 USPQ2d at 1328. However, a patentee may defeat a laches defense if the patentee can prove that the accused infringer "was itself guilty of misdeeds towards the patentee." *Aukerman*, 960 F.2d at 1038, 22 USPQ2d at 1333. In deciding that Biomet had not met its burden, the district court relied on its findings that Dr. Ramos acted with "reasonable diligence," and Biomet's failure to present evidence that, based on advice of legal counsel, it had a good-faith belief of non-infringement.

Biomet has not shown that the district court abused its discretion. Because

laches is an equitable defense, its determination depends on the particular facts and equities of the case. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576, 1 USPQ2d 1210, 1216–17 (Fed.Cir.1986). Biomet argues that it was prejudiced because "[f]rom 1983 through 1990, Biomet's sales and expenses relating to the accused device increased." However, economic prejudice does not arise merely because infringing activity was carried on during the period of delay. *Aukerman*, 960 F.2d at 1033, 22 USPQ2d at 1329. Biomet has not demonstrated that it made a disadvantageous change in its economic position during that period. *Id.*

Biomet also argues that it was prejudiced because the attorney who prosecuted Dr. Ramos' patent application died in 1988. Biomet does not state how this prejudiced its case for, as Dr. Ramos points out, the prosecution history was available. Further, the district court's finding that Biomet's behavior toward Dr. Ramos was egregious enough to bar the laches defense is not contested on this appeal.

The decision that laches does not bar this suit is affirmed.

*Appellant's Appendix, Vol. 2* at 356–57.

The Ramos litigation was resolved shortly thereafter with Biomet's payment to Ramos of $2.5 million. B & T, along with others, represented Biomet throughout the trial, appeal, and resolution of the Ramos litigation.

After resolution of the Ramos litigation, in the context of another dispute between Biomet and DePuy in which B & T no longer represented Biomet, B & T disclosed to DePuy certain communications it had with Biomet years earlier indicating Biomet's interest in a DePuy device. Biomet contends that because such disclosure did not occur in connection with the defense of the Ramos litigation, it was not authorized by the Agreement and caused harm to Biomet.

Biomet eventually obtained outside counsel to determine whether it had a cause of action against B & T arising out of the Ramos litigation. On October 7, 1997 Biomet filed an action for legal malpractice against B & T. Because of discussions that had developed, Biomet and B & T entered into an agreement on September 3, 1997 extending the statute of limitations for a causes of action brought by or against B & T to October 8, 1997. Under the agreement, the parties essentially agreed that if the statute of limitations was tolled, the time period for filing the claim would be extended to October 8, 1997. The agreement, however, did not prevent B & T from asserting that the statute of limitations was not tolled, and thus the statute of limitations had expired prior to entering the agreement.

B & T subsequently filed a motion for summary judgment based largely on the statute of limitations defense and the joint representation agreement. Following oral argument, the trial court entered summary judgment in favor of B & T. Biomet now appeals that judgment.

The standard of review applicable to rulings on summary judgment motions is well settled. "Summary judgment is appropriate only when no genuine controversy exists. In reviewing the propriety of summary judgment, this court applies the same standard as the trial court. The party seeking summary judgment has the initial burden of demonstrating that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law. Once the movant presents pleadings, depositions, answers to interrogatories, admissions or affidavits showing he or she is entitled to summary judgment, the

non-movant cannot rest on his pleadings, but must set forth specific facts establishing a genuine issue of material fact. A failure to establish a disputed issue of material fact will result in the grant of summary judgment provided the movant is entitled to judgment as a matter of law."

*Wal–Mart Stores, Inc. v. Bathe*, 715 N.E.2d 954, 960 (Ind.Ct.App.1999) (quoting *Duneland School Corp. v. Bailey*, 701 N.E.2d 878, 880 (Ind.Ct.App.1998)), *trans. denied.* We will affirm if the judgment is sustainable upon any theory supported by the record. *Strutz v. McNagny*, 558 N.E.2d 1103 (Ind.Ct.App.1990), *trans. denied.*

### 1.

■ Biomet first contends that the trial court erred in concluding that Biomet's claim against B & T for legal malpractice is time barred. Biomet urges this court to adopt the continuous representation rule to allow Biomet to toll the statute of limitations as long as the representation continued or until the appeal concluded the underlying matter in dispute. Under this rule, Biomet claims that the two-year statute of limitations commenced on September 8, 1995, the date that the Federal Circuit issued its opinion in the Ramos litigation. Thus, Biomet contends that its filing of the legal malpractice action against B & T was timely.

■ The statute of limitation for a claim of legal malpractice is two years. Ind. Code Ann. § 34–11–2–4 (West, PREMISE through 2001 1st Special Sess.). Further, legal malpractice actions are subject to the "discovery rule," which provides that the statute of limitations does not begin to run until such time as the plaintiff knows, or in the exercise of ordinary diligence could have discovered, that he had sustained an injury as the result of the tortious act of another. *Morgan v. Benner*, 712 N.E.2d 500 (Ind.Ct.App.1999), *trans. denied.* Therefore, B & T argues that under the statute of limitations, Biomet had two years from the date of discovery to bring its malpractice suit against B & T. B & T further contends that Biomet knew or should have known with the entry of the district court's judgment that it had been injured. Thus, Biomet should have filed its malpractice claim by September 1995. Instead, the malpractice claim was filed on October 7, 1997. As such, B & T asserts that Biomet's claim of malpractice was not timely filed.

■ Under the continuous representation doctrine, the statute of limitations does not commence until the end of an attorney's representation of a client in the same matter in which the alleged malpractice occurred. Although several jurisdictions have addressed whether the continuous representation doctrine should apply to the attorney-client relationship, this is an issue of first impression in Indiana.

After considering the competing policy considerations set forth by the parties, we conclude that Indiana should adopt the continuous representation doctrine to delay the commencement of the statute of limitations until the end of an attorney's representation of a client in the same matter in which the alleged malpractice occurred. The rationale for the rule has been summarized by Ronald E. Mallen & Jeffrey M. Smith in their treatise on attorney malpractice:

> The summary purpose of the continuous representation rule is to avoid disrupting the attorney-client relationship unnecessarily. Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys though the relationship continues, and there has not been and may never be any injury.

The continuous representation rule is consistent with the purpose of the statute of limitations, which is to prevent stale claims and enable the defendant to preserve evidence. When the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.

\* \* \* \* \* \*

The continuous representation rule is available and appropriate in those jurisdictions adopting the damage and discovery rules. The policy reasons are as compelling for allowing an attorney to continue his efforts to remedy a bad result, even if some damages have occurred and even if the client is fully aware of the attorney's error. The doctrine is fair to all parties concerned. The attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages. The client is not forced to terminate this relationship, though the option exists. The result is consistent with all expressed policy bases for the statute of limitations.

RONALD E. MALLEN & JEFFREY M. SMITH, 3 LEGAL MALPRACTICE § 22.13, 430–31 (5th ed.2000) (footnotes omitted).

We find the policies favoring the rule to be compelling. First, the continuous representation rule avoids disruption of the attorney-client relationship and gives attorneys the chance to remedy mistakes before being sued. *Janicki Logging &*

*Constr. Co., Inc. v. Schwabe, Williamson & Wyatt, P.C.,* 109 Wash.App. 655, 37 P.3d 309 (2001), *review denied* 146 Wash.2d 1019, 51 P.3d 88 (2002). At the same time, a client is not required to constantly second-guess the attorney, and in some cases, be forced to obtain other legal opinions regarding the attorney's handling of the case. *Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC.,* 69 Conn. App. 151, 795 A.2d 572 (2002). Furthermore, a client may fully be aware that his attorney has erred to his detriment and still be willing to place his confidence in the attorney's ability to correct the error. *R.D.H. Communications, Ltd. v. Winston,* 700 A.2d 766 (D.C.1997). We see no compelling reason for interfering with this fiduciary relationship.

■ Second, this rule does not limit the client's ability to seek redress immediately. The client may terminate the relationship without providing the attorney an opportunity to mitigate the damages, and make a claim of legal malpractice within two years of the date of termination.[2] At the same time, the rule prevents the client from having to adopt inherently different litigation postures, thereby compromising the success of both proceedings, by defending the attorney's actions in the appeal of the underlying action in which the alleged malpractice was committed and contesting the attorney's actions in the malpractice action. *See Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC.,* 69 Conn.App. 151, 795 A.2d 572. The rule further prevents an attorney from defeating a malpractice claim by continuing rep-

---

**2.** We note that the continuous representation doctrine does not apply to a client who retains new counsel on appeal. Furthermore, the rule does not delay the commencement of the statute of limitations until the end of the attorney-client relationship generally, but only during the attorney's representation of the client in the same matter from which the malpractice claim arose. *See Janicki Logging & Constr. Co., Inc. v. Schwabe, Williamson & Wyatt, P.C.,* 109 Wash.App. 655, 37 P.3d 309.

resentation until the statute of limitations has expired. *Id.*

B & T maintains that the legislature has articulated important reasons for requiring claims to be pursued in a prompt and timely manner. While we are aware that statutes of limitation are favored because they afford security against stale claims and enable the defendant to preserve evidence, we note that the continuous representation rule, as adopted in this context, is consistent with that purpose.

> "Stale claims will be prevented when the plaintiff is not duly diligent following termination of the relationship. In the interim, a claim still in litigation cannot be considered stale. The attorney-client relationship is preserved as fully as possible, guaranteeing the client that the attorney will put forth a better effort to preserve the client's interest. Speculative litigation is also avoided, as clients will not necessarily be required to file suit before the attorney attempts to avoid any damage to the client's interests."

*Wall v. Lewis,* 393 N.W.2d 758, 763 (N.D. 1986) (citation omitted).

B & T further argues that even if we allow the statute to be tolled, Biomet should only be given a reasonable period to file its claim, not the full two years. We adopt the continuous representation doctrine as an exception to our discovery rule. I.C. § 34–11–2–4 provides that an action for legal malpractice "must be commenced within two (2) years after the cause of action accrues." In a situation where the attorney continues to represent the client in the same matter in which the alleged malpractice occurred, the date of accrual begins at the termination of an attorney's representation of a client in the same matter in which the alleged malpractice occurred. Thus, any argument that equity does not toll the statute of limitations in the instant case is inapplicable. Likewise, B & T's argument that Biomet's twenty-two-month delay in filing suit after the cause of action accrued is unreasonable does not prohibit Biomet's claim of legal malpractice. Because we adopt the continuous representation doctrine as a way of defining accrual, Biomet had a full two years from the termination of its relationship with B & T in the Ramos litigation to bring the instant suit. *See R.D.H. Communications, Ltd. v. Winston,* 700 A.2d 766 (adopting the continuous representation rule as an exception to the discovery rule).

Accordingly, we reverse the decision below. The malpractice cause of action in this case did not accrue until the conclusion of the Ramos litigation.[3] Thus, Biomet's filing of the legal malpractice action against B & T was timely. To the extent that Biomet alleges that B & T breached its duties to Biomet by its failure to introduce certain evidence or its failure to provide advice concerning settlement, we conclude that there remain genuine issues of material fact and summary judgment is inappropriate.[4]

---

3. The Federal Circuit issued its opinion in the Ramos litigation on September 8, 1995. Shortly thereafter, the Ramos litigation was resolved with Biomet's payment to Ramos of $2.5 million. B & T represented Biomet throughout the trial, appeal, and resolution of the Ramos litigation.

4. Biomet contends that B & T withheld evidence of background design drawings prepared by Biomet two years prior to seeing the Ramos device as well as opinions of counsel sought and obtained from B & T both during the development of its prosthesis and after Ramos had filed suit because the evidence would have led to discovery of other opinions B & T had given to DePuy indicating that the DePuy devise might in fact infringe the Ramos patent. Biomet asserts that this evidence was essential to the district court's determina-

### 2.

Biomet also argues that the trial court erred in concluding, as a matter of law, that B & T did not commit malpractice with its alleged disclosure to DePuy of privileged communication. Biomet claims that B & T breached its obligation of confidentiality by sharing with DePuy the contents of an April 19, 1983 letter and attachments from B & T to Biomet expressing opinions about the Ramos device and patent. The letter suggested that Biomet was copying a DePuy device. Biomet alleges that this information was protected by Biomet's attorney-client privilege as it was not divulged to DePuy in the course of the Ramos litigation, but rather at some later date. The letter was subsequently used by DePuy in a dispute between Biomet and DePuy.

B & T argues that there is no evidence that the alleged disclosure occurred after the conclusion of the Ramos litigation. Assuming arguendo that the alleged disclosure occurred, B & T contends that it was authorized by the Agreement. The paragraph of the Agreement relating to the attorney-client privilege is as follows:

The first matter is that of the lawyer-client privilege. While the law is not settled, we believe that any information disclosed by you to us in connection with the Lawsuits will not be protected by the lawyer-client privilege in a subsequent legal proceeding asserted by or against any one of you involving the other. Moreover, we believe we cannot effectively represent both of you if information disclosed by one of you must be preserved by us in confidence from the other. If we are to continue to represent you in the Lawsuits, it will only be on the express understanding that each of you has waived the lawyer-client privilege to the extent, but only to the extent, that the privilege might otherwise require us to preserve, in confidence from the other, information disclosed by you to us in connection with the Lawsuits and in connection with any subsequent related legal proceeding asserted by or against any of you involving the other. We wish to emphasize that, in

tion on the issue of whether Biomet acted with "unclean hands" and was thus barred from asserting the defense of laches. As such, Biomet argues that its interests were compromised by B & T's decision to protect DePuy.

Biomet further contends that "B & T did not pursue or encourage consideration of settlement with Ramos with customary vigor because of the potential impact any such settlement would have on the relationship between Biomet and DePuy. A settlement with Ramos would have likely included an agreement under which Biomet would have obtained Ramos' rights in his disputed patent. If so, that would have put Biomet in a position adverse to DePuy as it relates to the DePuy device and Ramos patent. Possibly to avoid such a scenario, B & T appeared cool toward settlement and repeatedly assured Biomet that it was likely to prevail against Ramos." *Appellant's Brief* at 21–22.

B & T urges that its advice to Biomet concerning settlement was consistent with its duties as articulated by the Agreement. The Agreement contained the following paragraph relating to settlement negotiations:

The fourth matter relates to the possibility that one of you may decide to enter into individual settlement agreement with Dr. Ramos. If, as a part of such agreement, the settling party is asked or required to acknowledge infringement or validity of the patent, or make any other concessions or acknowledgements which may be detrimental to the position(s) of the non-settling party, then we must withdraw our representation on behalf of the settling party. Under such circumstances, we would propose to continue to represent the non-settling party, unless unethical to do so, and would recommend that the settling party consult with other counsel regarding the terms of settlement.

*Appellant's Appendix, Vol. 2* at 249.

our opinion, this limited waiver of the lawyer-client privilege will extend only to information disclosed by you in connection with the Lawsuits, and will specifically not extend to any information previously, or subsequently, disclosed to us by either of you in connection with other matters. Moreover, this limited waiver of the privilege will apply only to the extent that information disclosed by one of you may be disclosed to the other of you, and will not, in our opinion, extend to third parties. In other words, the information disclosed by one of you will be available to the other of you in the course of the Lawsuits, but will remain privileged with regard to third parties.

*Appellant's Appendix, Vol. 2* at 248.

The parties dispute whether the information allegedly disclosed by B & T to DePuy was information disclosed by Biomet in connection with the Ramos litigation. Furthermore, there is a question of fact as to when the alleged disclosure occurred. Thus, we conclude that there is a genuine issue of material fact as to whether B & T committed legal malpractice with its alleged disclosure to DePuy of privileged communication. Accordingly, the trial court's judgment is reversed and the cause remanded for further proceedings consistent with the views expressed in this opinion.

Judgment reversed and remanded.

BROOK, C.J., and MAY, J., concur.