**Pansy M. ICKES, Appellant–Plaintiff,**

v.

**Gregory K. WATERS, Esq., Appellee–Defendant.**

**No. 90A02–0703–CV–287.**

Court of Appeals of Indiana.

Jan. 22, 2008.

Nathan S.J. Williams, John S. Bloom, Shambaugh, Kast, Beck & Williams, LLP, Fort Wayne, IN, Attorneys for Appellant.

Jeffrey L. Hansford, Curtis P. Moutardier, Boehr, Stopher & Graves, LLP, New Albany, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Pansy M. Ickes alleges Gregory K. Waters failed to exercise ordinary skill and knowledge in counseling her and preparing her estate plan. Pansy appeals from summary judgment for Waters. We affirm, finding the trial court properly concluded the statute of limitations had run.

### FACTS AND PROCEDURAL HISTORY

Raymond and Pansy Ickes had lived together as husband and wife since 1953.[1]

---

1. Raymond and Pansy believed they were married, but the validity of the marriage was later called into doubt. The legal status of

They did not have any children together. Pansy had two children from a previous relationship: Randall Brown and Jerry Brown. Raymond also had two children from a previous marriage: Diana Odom and Jerry Ickes.

During his life, Raymond owned and operated Raymond Ickes R.V. Supplies. Randall worked for Raymond for several years. Other employees told Raymond that Randall was stealing from the company, and Randall was fired.

At that time, Raymond and Pansy had wills leaving everything to the surviving spouse, and the residue was to be divided equally among their four children. After his falling out with Randall, Raymond wished to change his estate plan. Diana set up an appointment with Waters for Raymond and Pansy.

On February 15, 2001, Waters met with Raymond and Pansy to discuss their estate plan. Jerry Ickes and Diana were also present. At the beginning of the meeting, Raymond talked for about half an hour about his goals. He represented they both wanted Raymond's children to inherit everything because Randall had stolen from the company and Jerry Brown was terminally ill and had no children. He also stated Jerry Ickes and Diana should control the business when Raymond was no longer able and Pansy should be protected from undue influence by Randall. Raymond was in poor health, and it was anticipated he would die before Pansy. Raymond wanted Pansy to be able to maintain her current standard of living after he passed away. Pansy did not contradict Raymond, and she said very little during the entire meeting.

After Raymond discussed their goals, Waters proposed an estate plan. He recommended they put their assets into a trust. Raymond would be the trustee and

would have the power to amend or revoke the trust during his life. Upon his death, the trust would become irrevocable. Jerry Ickes and Diana would be the successor trustees. The trustees would be directed to maintain Pansy in her customary standard of living.

Waters then solicited questions, but Pansy did not ask him anything. Diana asked Pansy if she understood her children would inherit nothing, and she responded, "Yes." (Appellant's App. at 46.) Diana asked Pansy if there were any items of personal property she wanted to leave to her family, and she said, "No." (*Id.* at 47.)

In March of 2001, Waters sent drafts of the trust agreement and pour-over wills to Raymond and Pansy. He included a letter that asked them to review the documents and contact him with any questions or changes. Neither Pansy nor Raymond contacted Waters to ask questions.

On April 17, 2001, Pansy and Raymond met with Waters to execute the documents. Waters again summarized how the estate plan would operate. The description was essentially the same as the one given at their first meeting. On or about May 7, 2001, Pansy and Raymond met with Waters to transfer their assets to the trust.

Sometime thereafter, Jerry Ickes told Pansy he did not think a step-mother should receive anything. When Pansy told Raymond about that, he amended the trust to ensure Pansy would receive at least $1000 a month and removed Jerry Ickes as a successor trustee. Richard Paxson, an investment advisor with Edward Jones, made the amendment for Raymond. Neither Raymond nor Pansy contacted Waters about the amendment.

their relationship does not have a bearing on this case.

Raymond died on July 25, 2003. After Raymond's death, Diana told Pansy she would not pay "very much" out of the trust and wanted Pansy to "cut back." (*Id.* at 124.) Pansy told her grandson-in-law, Chris Jennerjahn, about the problems she was having with Diana. She told Chris that Waters "had represented her as an attorney." (*Id.* at 175.) Chris contacted Waters to see if he could help Pansy. Waters stated he was representing Diana and the trust. Chris obtained different counsel for Pansy, who sought to have Diana removed as trustee. That action resulted in a settlement. Thereafter, on April 18, 2005, Pansy filed suit against Waters.

## DISCUSSION AND DECISION

In reviewing summary judgment, we apply the same standard as the trial court. *Wright v. American States Ins. Co.,* 765 N.E.2d 690, 692 (Ind.Ct.App.2002). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). "Any doubt as to a fact, or an inference to be drawn, is resolved in favor of the non-moving party," here, Pansy. *Sanchez v. Hamara,* 534 N.E.2d 756, 757 (Ind.Ct.App. 1989). The moving party bears the burden of proving there is no genuine issue of material fact; however, once this burden is sustained, the opponent may not rest on the pleadings, but must set forth specific facts showing there is a genuine issue for trial. T.R. 56(E); *Oelling v. Rao,* 593 N.E.2d 189, 190 (Ind.1992). We consider only the evidence designated to the trial court. T.R. 56(H); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 973 (Ind.2001). We affirm summary judgment on any legal basis supported by the designated evidence. *Bernstein v. Glavin,* 725 N.E.2d 455, 458–59 (Ind.Ct.App.2000), *trans. denied* 741 N.E.2d 1248 (Ind.2000). The appellant

bears the burden of persuading us the grant of summary judgment was erroneous. *Bank One Trust No. 386 v. Zem, Inc.,* 809 N.E.2d 873, 878 (Ind.Ct.App. 2004), *trans. denied* 822 N.E.2d 975 (Ind. 2004).

Pansy raises several issues on appeal. However, we find one issue dispositive: whether Pansy's suit is barred by the statute of limitations. The statute of limitations for attorney malpractice is two years. *Klineman, Rose & Wolf, P.C. v. North Am. Laboratory Co.,* 656 N.E.2d 1206, 1207 (Ind.Ct.App.1995). The statute of limitations begins to run when the plaintiff knows of, or in the exercise of ordinary diligence could have discovered, the tortious conduct. *Biomet, Inc. v. Barnes & Thornburg,* 791 N.E.2d 760, 765 (Ind.Ct. App.2003), *trans. denied* 804 N.E.2d 754 (Ind.2003).

Pansy argues the statute of limitations did not begin to run until Raymond died, while Waters argues it began to run when the trust was funded. Pansy cites *Shideler v. Dwyer,* 275 Ind. 270, 417 N.E.2d 281 (Ind.1981), in support of her argument. Shideler drafted a will for Robert Moore. The will contained the following provision:

> I specifically direct Dominic L. Angelicchio to use his best efforts as long as he owns any shares of stock of Moorfeed Corporation, to cause the Corporation to continue the employment of Mary Catherine Dwyer until her retirement or her other service termination date, then from and after such date and until her death, or the death of Dominie [sic] L. Angelicchio prior thereto, Dominie [sic] L. Angelicchio shall cause the Corporation to pay Mary Catherine Dwyer as a retirement benefit the sum of $500 per month.

*Id.* at 274, 417 N.E.2d at 284. After Moore's death, the probate court ruled the provision was void. Dwyer filed suit

against Shideler, alleging he should have known the provision would be held void. Shideler argued the action was time-barred, but Dwyer argued the statute of limitations did not begin to run until the provision was declared void.

> Our Supreme Court held Dwyer
>
> confused damage, as a requisite element of any tort with damages as a measure of compensation. For a wrongful act to give rise to a cause of action and thus to commence the running of the statute of limitations, it is not necessary that the extent of the damage be known or ascertainable but only that damage has occurred.

*Id.* at 282, 417 N.E.2d at 289. Because a will becomes operative on the testator's death, Dwyer suffered injury at that time. *Id.* at 285, 417 N.E.2d at 290. Moore's will did not have "dispositive effect" until he died because he could have changed it at any time prior to his death. *Id.* Upon his death, "the wrong, if any, set in motion with the drafting of Moore's Will became irremediable with his death." *Id.*

▮ We agree with Waters that *Shideler* is distinguishable. First, *Shideler* involved a will, and wills do not have "dispositive effect" until the testator dies. *Id.* The Ickes' trust, however, was an *inter vivos* trust and was operative when it was executed. Furthermore, Dwyer did not have an interest in Moore's assets other than the expectation of an inheritance. Pansy, on the other hand, had been a joint owner of the property that funded the trust. She lost control of that property when she transferred it to the trust without retaining any power to revoke or amend. Pansy's injury, if any, occurred on May 7, 2001, when she funded the trust.[2] Her loss of control over her property was "irremediable" at that time. *Id.* Although

Pansy's damages would have been slight if Raymond had revoked the trust, she suffered damage "as a requisite element of any tort" when she gave up control of her property upon Waters' advice. *Id.* at 282, 417 N.E.2d at 289.

The designated evidence shows Waters explained Raymond would be the trustee and would have the power to amend or revoke, and when he died, Jerry Ickes and Diana would control the trust. During her deposition, Pansy indicated she knew Raymond was the only person who could amend or revoke the trust and the trust would be distributed only to Jerry Ickes and Diana. Pansy also demonstrated she knew she did not have control over the property when she asked Raymond to amend the trust. Therefore, the statute of limitations began to run on May 7, 2001, when the trust was funded and Pansy lost control of her assets. Pansy did not file suit until April 18, 2005; therefore, her suit is time-barred.

▮ Alternatively, Pansy argues the statute of limitations did not run because of the "continuous representation doctrine." (Appellant's Br. at 18.)

> In a situation where the attorney continues to represent the client in the same matter in which the alleged malpractice occurred, the date of accrual begins at the termination of an attorney's representation of a client in the same matter in which the alleged malpractice occurred.

*Biomet,* 791 N.E.2d at 767. Pansy's only designated evidence is the affidavit of Chris Jennerjahn. Chris' affidavit states that after Raymond's death, Pansy told Chris she was having problems with Diana and the trust. She told Chris that Waters

---

**2.** Nor does Pansy receive help from *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos,* 868 N.E.2d 4, 21 (Ind.Ct.App.2007).

That case involved a will and testamentary trust, which also only have dispositive effect on the settlor's death.

"had represented her as an attorney." (Appellant's App. at 175.) Chris then contacted Waters to seek assistance on behalf of Pansy.

Pansy contends this affidavit, at a minimum, creates an issue of fact as to whether Waters continued to represent her. Chris' affidavit indicates only that Waters had represented Pansy in the past. It does not indicate Pansy considered their attorney-client relationship to be ongoing. It does not even indicate that Pansy wanted Chris to contact Waters.

Pansy urges us to adopt "Ohio's general rule which requires an attorney to provide actual notice to a client of the termination of the attorney-client relationship." (Appellant's Reply Br. at 4.) "In the absence of a clear-cut affirmative act by either party which terminates the relationship, the parties' subjective intent and reasonable expectations should be considered." (*Id.*) Even if we were to adopt this rule, Pansy has not designated evidence that she subjectively intended or reasonably expected the relationship to continue. Therefore, summary judgment was appropriate.

Affirmed.

DARDEN, J., and CRONE, J., concur.