**Steven L. HUDSON and Roxann Hudson, Appellants–Defendants,**

v.

**Edgar E. DAVIS, Guardian of Billy D. Crabtree, Appellees–Plaintiffs.**

No. 54A01–0303–CV–77.

Court of Appeals of Indiana.

Oct. 10, 2003.

Rehearing Denied Dec. 15, 2003.

C. Rex Henthorn, J. Lamont Harris, Henthorn Harris & Weliever, Crawfordsville, IN, Attorneys for Appellants.

James E. Ayers, Wernle Ristine & Ayers, Crawfordsville, IN, Attorney for Appellees.

## OPINION

FRIEDLANDER, Judge.

Edgar E. Davis, as guardian of Billy D. Crabtree, filed suit against Steven and Roxann Hudson seeking to have a land contract declared void as the result of fraud or undue influence. The Hudsons appeal the trial court's entry of summary judgment in favor of Davis, which declared the contract void as a matter of law and ordered the contract rescinded.

We reverse and remand.

The facts considered in a light most favorable to the Hudsons follow. Crabtree was born on April 4, 1930, and his closest living relatives are first cousins with whom he does not have a close relationship. As early as the fall of 1994, Crabtree and Steven Hudson, Crabtree's neighbor and tenant farmer, began discussing the transfer of Crabtree's farm to Hudson. Crabtree expressed to Hudson that he was worried about his future and the future of

the farm. Crabtree did not want the farmland developed, and he was also concerned about tax consequences following a sale of the land. Hudson insisted on purchasing the land rather than Crabtree giving it to him.

On April 22, 1996, without Hudson's prior knowledge or involvement, Crabtree executed a durable power of attorney designating Hudson as his attorney in fact. At some point thereafter, Hudson learned of the appointment. The power of attorney authorized Hudson to, among other things, make contracts and sell real estate on Crabtree's behalf and obtain medical treatment or hospitalization for Crabtree. Notwithstanding the execution of the power of attorney, Crabtree continued to live independently and attend to his own personal and financial affairs. Hudson exercised the power of attorney on only one occasion, to obtain Crabtree's release from the hospital on August 7, 2001.

At some point, Hudson undertook to draft an agreement for his purchase of Crabtree's farm. Hudson prepared several drafts of the written agreement (without the assistance of an attorney) for Crabtree's review. Crabtree requested certain revisions, which Hudson incorporated into later drafts. The two tinkered with the drafts for quite some time before agreeing on a final version. Thereafter, on March 18, 1997, Crabtree and the Hudsons entered into a written agreement entitled "Contract for Purchase of Real Estate" (the Contract), whereby Crabtree agreed to convey immediate possession of his 250-acre farm to the Hudsons with title passing upon payment of the purchase price. The stated consideration for the Contract was the Hudsons' promise to pay a purchase price of $300,000 in annual installments of $13,000 ($10,000 principal and

$3000 interest) for thirty years or until Crabtree's death, whichever occurred first. All unpaid payments were to be forgiven in the event of Crabtree's death. The Contract also provided that Crabtree retain the use of the residence and other improvements on the land for his lifetime.[1]

Crabtree continued to live in the residence until he was admitted to the hospital on or about July 31, 2001 due to very poor health. He had not been eating or caring for himself well, he had several sores on his body, and he was significantly confused and disoriented. Davis, Crabtree's cousin, filed a Petition For Emergency Appointment of Temporary Guardian on August 8, alleging in part:

> That the need exists for the appointment of a guardian of Billy D. Crabtree in that he is living in filth and vermin infested quarters and exercises no personal hygiene that has resulted in his hospitalization. He expresses a lack of understanding of his financial affairs and his assets need to be preserved for his proper care and support and medical treatment. Your petitioner is interested in this appointment because he is one of the alleged incapacitated person's closest relatives.

*Appellants' Appendix* at 24–25. On August 9, the court found Crabtree to be incapacitated by reason of his confusion and delusions and appointed Davis as the temporary guardian of Crabtree's person and estate.

Thereafter, Davis initiated the instant action on September 14, 2001 seeking to have the Contract between Crabtree and the Hudsons declared void. On June 27, 2002, Davis filed Plaintiff's Motion for Summary Judgment. In this motion, Davis alleged that Hudson obtained an

---

**1.** The Hudsons undertook to pay all real estate taxes, to carry insurance, and to pay for all reasonable and normal repairs to the residence and other improvements on the land.

unfair advantage in the Contract to purchase Crabtree's farmland and, therefore, the law imposes a presumption that the Contract was the result of undue influence. In addition to Hudson's status as Crabtree's attorney in fact, Davis relied on the fact that Crabtree was sixty-seven years old when the thirty-year installment contract was executed and evidence that the fair market value of the property in March 1997 was $520,000 and the fair rental value of the land for farm purposes was approximately $30,000 per year.

The day after Davis filed for summary judgment, the Hudsons filed a Motion for Reformation of Contract or, in the Alternative, an Order to Reform Contract. This motion, which was originally filed in the guardianship proceedings [2] rather than in the instant cause, stated in relevant part:

Comes now Steve Hudson, intervener herein, and respectfully shows the Court:

1. That intervener was designated by Billy Crabtree, the alleged incapacitated person herein, to serve as his guardian by reason of a written durable power of attorney prepared at the request of Billy Crabtree by an attorney representing Billy Crabtree ...;

2. That the relationship between intervener and Billy Crabtree during the past 10 years has grown from a relationship of a neighbor, farm operator, tenant into a relationship of friendship and support by intervener of Billy Crabtree without intervener assuming any material duties as attorney-in-fact of Billy Crabtree;

3. That Billy Crabtree and intervener entered into a certain contractual relationship on or about March 18, 1997, intended to implement a contract for life care by intervener for Billy Crabtree with farm land described therein to serve as security for intervener's performance of its obligations.

4. That the contract ... was prepared by intervener without the assistance of an attorney or others familiar with life care contracts and reads as a 30 year installment contract ... but fails to sufficiently reflect the agreement of the parties if circumstances develop requiring more to be paid for the care of Billy Crabtree than the amounts set forth as payments therein.

5. That intervener has for many years provided substantial services and materials to Billy Crabtree without reimbursement and continues to stand ready and able to provide reasonable necessities of life care for Billy Crabtree as intended by the contractual arrangement between intervener and Billy Crabtree, including, without limitation, the provision of funds with which to care for Billy Crabtree at the Ben Hur Nursing Home where he currently is residing.

6. That intervener also stands ready and able to undertake the duties as guardian of the person of Billy Crabtree at this time;

7. That intervener also stands ready and able to undertake the duties as guardian of the estate of Billy Crabtree as [sic] such time as the aforesaid contract arrangement has been implemented in a fashion that removes intervener from any responsibilities to modify to conform with the intentions of the parties and/or any enforcement of the same by Billy Crabtree.

8. That it is in the best interests of Billy Crabtree that the contractual relationship between Billy Crabtree and

2. Hudson intervened in the guardianship proceedings in November 2001.

intervener be reformed or, in the alternative, a modification or supplement to the contractual relationship ... be authorized and executed clarifying and stating the intentions of the parties of a life care contract for the benefit of Billy Crabtree with the real estate serving as security for intervener's performance of its obligations thereby providing the necessary cash flow for Billy Crabtree's care and avoiding the depletion of assets through endless litigation.

WHEREFORE intervener respectfully prays the Court to reform, or in the alternative, to issue a protective or other order authorizing the execution of a supplemental agreement and/or a modification of the contractual arrangement between intervener and Billy Crabtree through his permanent guardian to clarify such agreement by adding terms thereto which provide for:

1. Intervener paying the reasonable costs of nursing home care for Billy Crabtree at the Ben Hur Nursing Home for the rest of his life;

2. A transfer of legal title of the real estate to intervener with appropriate reservations of a lien or other charge against real estate by Billy Crabtree as security for intervener's performance of the obligations of the life care obligation owed to Billy Crabtree;

3. And such other provisions necessary or desirable as the Court may direct are needed to reflect the entire agreement between the parties.

*Appellants' Appendix* at 133–35.

On September 19, 2002, the Hudsons filed their response to the motion for summary judgment, relying in large part on the motion filed by Hudson in the guardianship proceedings seeking reformation of the Contract to evidence a life care contract as allegedly intended by the parties. The Hudsons specifically argued that the Contract did not result in an unfair advantage to Hudson "because of the risks and uncertainties of the mortality of Billy Crabtree and the degree of care he might need". *Appellants' Appendix* at 74.

The guardianship court transferred Hudson's claim for reformation to this action on October 23, 2002. Thereafter, upon leave of court, the Hudsons amended their responsive pleadings by adding a claim for reformation based upon mutual mistake on November 20, 2002. Following a hearing on Davis's motion for summary judgment, the trial court granted partial summary judgment in favor of Davis, declaring the Contract void and ordering rescission. The trial court directed the parties to confer and agree, if possible, on the details of the rescission. The Hudsons filed a motion to correct error, which the trial court denied. The Hudsons now appeal, arguing that issues of material fact exist precluding the grant of summary judgment.

The standard of review in summary judgment cases is well settled:

Our standard of review is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the facts are capable of supporting conflicting inferences. Any doubt as to a fact or an inference to be drawn is resolved in favor of the nonmoving party. We must carefully review a decision on a summary judgment motion to ensure that a party was not improperly denied its day in court.

*Poznanski ex rel. Poznanski v. Horvath,* 788 N.E.2d 1255, 1258 (Ind.2003) (citations omitted).[3]

 We first address the Hudsons' claim for reformation of the Contract, which is at the heart of most of their arguments on appeal. Reformation is an extreme equitable remedy utilized to relieve the parties of mutual mistake or fraud. *Estate of Reasor v. Putnam County,* 635 N.E.2d 153 (Ind.1994). In cases involving mutual mistake, such as this one, the party seeking reformation must establish by clear and convincing evidence "the true intentions of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true intention of the parties." *Id.* at 158. "A mistake of law, a mistake as to the legal import of language used, will not normally support a claim for reformation of an instrument." *Peterson v. First State Bank,* 737 N.E.2d 1226, 1229 (Ind.Ct.App.2000). Rather, the alleged mutual mistake must be one of fact. *Estate of Spry v. Greg & Ken, Inc.,* 749 N.E.2d 1269 (Ind.Ct.App. 2001). "In addition, 'equity should not intervene and courts should not grant reformation where the complaining party failed to read the instrument, or, if he read it, failed to give heed to its plain terms.' " *Id.* at 1275 (quoting *Gierhart v. Consol. Rail Corp.-Conrail,* 656 N.E.2d 285, 287 (Ind.Ct.App.1995)). A mistake by the scrivener, however, will permit reformation where it is logically indicated that both parties were mistaken as to the actual contents of the instrument. *Peterson v. First State Bank,* 737 N.E.2d 1226.

In the instant case, Hudson averred in his affidavit that he drafted the Contract in question "with the intent of memorializing a life care contract ... that [he] would care for Billy Crabtree, then aged 67, by providing him shelter (including nursing home care if required) and sufficient funds to acquire clothing, food, reading material, to pay utilities and some spending money for recreational items for the remainder of his life". *Appellants' Appendix* at 84. The Hudsons rely solely on the following testimony of Hudson (from the guardianship proceedings) to support their claim that a genuine issue of material fact exists as to whether the Contract should be reformed:

Q. Alright. What were the parameters with coming up with the final version? What were you endeavoring or your [sic] intending to accomplish with it?

A. To provide for Billy for the rest of his life. A place to live, an income, you know, his needs financially for the rest of his life, that no one could take away from him. And uh, and to avoid as much as possible, all taxes.

\* \* \*

Q. Alright. The, uh, I read that agreement, Mr. Hudson, and I don't see anything in there about taking care

---

**3.** We reject Davis's assertion that in order to survive summary judgment the Hudsons were required to present sufficient evidence to satisfy the clear and convincing evidence standard necessary to negate the presumption of undue influence. Davis directs us to *Heeb v. Smith* in support of his assertion. *Heeb v. Smith,* 613 N.E.2d 416 (Ind.Ct.App.1993), *trans. denied.* In that case, we held that "the chilling effect of a defamation suit on the exercise of First Amendment rights calls for a judicial attitude more favorable to summary judgment than in the ordinary case" and, therefore, required the public figure plaintiff to present "sufficient evidence to carry the clear and convincing evidence standard" in order to survive summary judgment. *Id.* at 420. The instant case, however, is an "ordinary case" that does not present similar constitutional concerns.

of Billy's financial needs for the rest of his life. If that's there can you point it out to me or what was intended to do that?

A. Well, I, as has been pointed out to me recently, you know, I guess, you know, there was, not knowing what I was doing I probably shouldn't have even have wrote it. I guess this actually should have been called an annuity instead of a contract. And the, alright, under number four, I believe, anyway, where it says that Billy has the, retain the use of the residence and improvements for the remainder of his life or as long as he desires, and then on five it says, you know, that I am, I'm responsible for the upkeep of that and that he has a place to live. I guess I, I guess I could have, I should have spelled that or written that out better. I knew, I knew what I meant and Billy knew what I meant, but uh, I was, that I was going to see to it that he had a place to live....

* * *

Q. Did you, when you were putting this together, Mr. Hudson, give any thought or consideration to the fact that we'd be where we are right now, and that is, with Billy in a nursing home?

A. Oh yeah, yeah. I, with Billy telling me what he told me about he didn't even know if, who was alive or if anybody was alive, I mean, he told me he used to have a lot of relatives in Kentucky and that he'd had an aunt in, I believe he said Kokomo, or I don't know, but anyway, he had lost track and really he indicated he thought maybe they'd all died. And he did make reference to that he had a cousin, he didn't name him, but that he had a cousin that had used to stop by and leave him notes but he hadn't found any notes in a long time, so he didn't know about that. Well anyway, I, I had the feeling, I really knew deep down, you know, that Billy's situation, being a bachelor and everything, the day was going to come that he'd probably end up in a nursing home. *I knew that the terms of this contract would not meet, financially meet his expenses. I have been prepared from day one to, uh, for when, if that eventuality matured I was fully prepared to meet those bills to modify this thing if that's what needs to be done, cooperate with court supervision or whatever, to, you know, pay that, pay those bills.* Cause I told, you know, I told Billy, I made him a promise that I'd take care of him the rest of his life and that's what this was suppose to say and uh, I'm more than willing to stand by that. I have every intentions [sic] of standing by that, always have.

*Appellants' Appendix* at 90–92 (emphasis supplied).

■ We cannot agree with the Hudsons that a genuine issue of material fact exists with regard to the propriety of reformation in this case. Here, Hudson was the drafter of the Contract, the plain terms of which did not set forth any sort of life care contract. This is simply not a case of mistake of fact or scrivener error. As Hudson testified, he knew that the "terms" of the Contract would not financially meet Crabtree's expenses if Crabtree were placed in a nursing home and that he has been willing "from day one" to "modify" the Contract to pay those expenses. *Id.* at 92. While Hudson may be commended for

his intentions (if true), we observe that the Contract as clearly written does not place such an obligation on the Hudsons. Moreover, to the extent the Hudsons assert that Hudson was unsuccessful in his attempt to create a life care contract because he is a farmer untrained in the law, we observe that this amounts to a mistake of law (i.e., the legal effect of the terms of the Contract), not a mistake of fact or scrivener error. We may not reform an agreement to correct the drafter's mistake of law. *See, e.g., Estate of Spry v. Greg & Ken, Inc.,* 749 N.E.2d 1269; *Wedel v. American Elec. Power Serv. Corp.,* 681 N.E.2d 1122 (Ind.Ct.App.1997), *trans. denied.*

▄▄ Although we conclude that the trial court correctly determined that reformation was improper as a matter of law, our inquiry into the propriety of summary judgment has just begun. We must now determine whether a genuine issue of material fact exists regarding Davis's claim of undue influence.

In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. These relationships include, among others, principal and agent. Where the relationship is one of principal and agent, if the plaintiff's evidence establishes (a) the existence of a fiduciary relationship, and (b) the questioned transaction between the two (2) parties resulted in an advantage to the dominant party in whom the subordinate party had reposed both their trust and confidence, "the law imposes a presumption that the transaction was the result of undue influence exerted by the domi-

nant party, constructively fraudulent, and thus void." Once these facts are established, the burden shifts to the dominant party in the relationship to rebut the presumption by clear and unequivocal proof. Undue influence is defined as "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised."

*In re Estate of Wade,* 768 N.E.2d 957, 961–62 (Ind.Ct.App.2002) (citations omitted), *trans. denied.*

▄▄ It is beyond dispute that Hudson and Crabtree were in a fiduciary relationship at the time of the Contract. *See WW Extended Care, Inc. v. Swinkunas,* 764 N.E.2d 787, 792 n. 4 (Ind.Ct.App.2002) ("[a] power of attorney creates an agency relationship between the person granting the power of attorney (the principal) and the designated attorney-in-fact (the agent)"). Further, the presumption of undue influence attaches to transactions entered into during the existence of a fiduciary relationship regardless of whether the fiduciary actually used his fiduciary powers to complete the transactions. *See In re Estate of Wade,* 768 N.E.2d 957; *Villanella v. Godbey,* 632 N.E.2d 786 (Ind.Ct. App.1994).

We further conclude that as a matter of law the Contract resulted in an advantage to the Hudsons. The terms of the Contract are exceptionally favorable to the Hudsons. The Contract provides for the Hudsons to purchase the property, appraised by a licensed appraiser at approximately $520,000,[4] for only $300,000 payable

---

4. We observe that the appraisal does not appear to take into consideration that Crabtree retained use of the residence and improvements on the land for his lifetime. Therefore,

the $520,000 value might be slightly high. We do not, however, agree that Hudson's self-serving estimate of the property's fair market value between $300,000 and $354,000 in his

in yearly installments over a period of thirty years at a nominal rate of interest. The annual payment of $13,000 is less than one half of the current cash rental value set forth in the appraisal. Moreover, the Contract contains a forgiveness clause such that if Crabtree (age sixty-seven at the time of the Contract) dies within the thirty-year period, the remaining balance is forgiven. These are without question extraordinarily beneficial terms for the purchasers.

■ In light of Hudson's fiduciary relationship with Crabtree and the beneficial terms of the Contract for the Hudsons, a presumption arises that the Contract was the result of undue influence exerted by Hudson, constructively fraudulent, and thus void.[5] *See In re Estate of Wade,* 768 N.E.2d 957. A fiduciary, however, may rebut this presumption "by establishing by clear and convincing evidence that he acted in good faith, did not take advantage of his position of trust, and that the transaction was fair and equitable." *Villanella v. Godbey,* 632 N.E.2d at 790. We have recently stated in more specific terms that the presumption of constructive fraud may be rebutted by the fiduciary with clear and unequivocal proof that: (1) there was no making of deceptive material misrepresentations of past or existing fact or remaining silent when a duty to speak exists; (2) there was no reliance thereon by the complaining party; or (3) the complaining party was not injured as a proximate result

thereof. *Strong v. Jackson,* 777 N.E.2d 1141 (Ind.Ct.App.2002), *reh'g granted on other grounds,* 781 N.E.2d 770, *trans. denied.*

■ In the instant case, the Hudsons contend that they have designated evidence to rebut the presumption sufficient to raise questions of fact and overcome summary judgment. The Hudsons assert that the designated evidence reveals a good-faith course of dealing involving an arms-length transaction in which Crabtree closely examined the terms of the Contract and worked with Hudson over a period of time to ensure that his objectives were met.

The evidence most favorable to the Hudsons reveals that Crabtree had no close relatives and relied on Hudson, his neighbor and tenant farmer, for friendship and assistance. In their talks, Crabtree expressed to Hudson concerns about his future and the future of the farm. Crabtree did not want the farm to fall into the hands of a stranger and become developed. At some point, Crabtree indicated a desire to give his property to Hudson at his death. Hudson, however, insisted on purchasing the property and eventually undertook to draft an agreement for the purchase of Crabtree's farm.

Crabtree expressed to Hudson specific goals sought to be accomplished in the transfer. Most notably, Crabtree wanted to avoid taxes as much as possible and he wanted to ensure that he would have a

affidavit raises an issue of fact as to whether the Hudsons obtained an advantage.

5. The Hudsons argue that this common-law presumption has been legislatively abrogated by Ind.Code Ann. § 30–5–9–2 (West 1994) of the Indiana Power of Attorney Act (the Act). We initially observe that the Act applies in situations in which the attorney in fact actually exercises the powers granted under the power of attorney to complete the questioned transaction. Such is not the case here.

Moreover, we observe that I.C. § 30–5–9–2 provides, in relevant part, that an attorney in fact *who acts with due care for the benefit of the principal* is not liable or limited merely because the attorney in fact also benefits from the act. The common-law presumption, therefore, would apply in such situations to require the attorney in fact to establish that he or she acted with due care for the benefit of the principal.

place to live for the rest of his life. In an attempt to satisfy Crabtree's tax-avoidance objective, Hudson sought tax advice and ascertained the value of the property when it was devised to Crabtree in 1981. This figure was used in arriving at the purchase price in the Contract, presumably to avoid capital gains. Based on statements made by Crabtree following the Contract, Hudson believed that he successfully achieved this objective for Crabtree. In regard to Crabtree's other primary objective, Hudson incorporated a provision in the Contract that allowed Crabtree to retain use of the residence, as well as other improvements on the land, for Crabtree's lifetime. Hudson also provided in the Contract that he would maintain and repair the residence for Crabtree. Hudson prepared several drafts of the Contract and incorporated certain revisions requested by Crabtree after reviewing each draft. The two conferred for some time before settling on a final version. Thereafter, Crabtree signed the Contract in the presence of a notary.

The designated evidence further reveals that Crabtree was living independently at the time the Contract was entered into, "attending to his own business affairs, attending to his own personal care, . . . and paying his own bills." *Appellants' Appendix* at 85. Moreover, while Hudson had been appointed as Crabtree's attorney in fact, he did not exercise any powers under said appointment until well after execution of the Contract. At the time of the Contract, Hudson intended to help care for Crabtree and exercise his power of attorney once Crabtree could no longer live independently.

The facts set forth above are generally not supported by evidence outside of Hudson's own affidavit and testimony. We cannot, however, judge Hudson's credibility at this stage in the proceedings and, therefore, are constrained to conclude that the designated evidence presents genuine issues of material fact regarding Hudson's good faith and fair dealings with Crabtree.[6] We recognize that the Hudsons face a considerable burden at trial, at which they will be required to present clear and convincing evidence rebutting the presumption of undue influence. Summary judgment, nevertheless, should not be used as an abbreviated trial, even where the proof is difficult or where the court may believe that the non-moving party will not succeed at trial. *Rollings v. Smith,* 716 N.E.2d 502 (Ind.Ct.App.1999). The Hudsons should be given the opportunity to develop the record fully, permitting the trial court to weigh the evidence and judge the credibility of the witnesses. *See id.*

Judgment reversed and remanded.

ROBB and VAIDIK, JJ., concur.

---

**6.** We have previously upheld transactions that on their face greatly benefit the fiduciary at the expense of the principal. For example, in *Villanella v. Godbey,* 632 N.E.2d 786, we affirmed a judgment in favor of a fiduciary who received substantial gifts from his principal, including the transfer of tens of thousands of dollars in cash and thirty-seven acres of real property for nominal or no consideration. We found that the evidence supported the trial court's determination that the fiduciary sufficiently rebutted the presumption of undue influence. We noted, among other evidence, that the principal was of sound mind when she made the transfers, she personally signed the transfer documents, she thoroughly read the documents and assured her attorney that this is what she wanted, and her attorney testified that she voluntarily deeded the farm as a gift. We further observed that the fiduciary "not only assisted Geneva with her business affairs, but he also took care of her after her surgeries and during her decline, and thus, she may have wanted to show her appreciation." *Id.* at 791.