Norman R. CARLSON, Jr., Individually and as Executor of the Estates of Norman R. Carlson and Hilda D. Carlson, Deceased, and as Trustee of the Trusts Established Under the Last Wills and Testaments of Norman R. Carlson and Hilda D. Carlson; Margaret Ann Carlson, Beth Carlson Montigue, and David R. Carlson, Appellants–Plaintiffs,

v.

SWEENEY, DABAGIA, DONOGHUE, THORNE, JANES & PAGOS; and John H. Sweeney, Appellees–Defendants.

No. 46A05–0602–CV–94.

Court of Appeals of Indiana.

June 7, 2007.

Opinion Corrected on Rehearing Aug. 8, 2007.
See 2007 WL 2258124.

**8**

Steven K. Huffer, Huffer & Weathers, P.C., Indianapolis, IN, Attorney for Appellant.

Robert G. Devetski, Barnes & Thornburg LLP, South Bend, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

Norman R. Carlson, Jr., individually, and as executor of the estates of Norman R. Carlson and Hilda D. Carlson, and as Trustee of the Trust established under the last wills and testaments of Norman Sr. and Hilda, Margaret Ann Carlson, Beth Carlson Montigue, and David R. Carlson, (when referred to collectively, the "Carlsons"), filed a complaint against the law firm of Sweeney, Dabagia, Donoghue, Thorne, Janes and Pagos, and lawyer John H. Sweeney (the "Lawyers"), alleging legal malpractice that resulted in adverse tax consequences. The Lawyers filed a motion for summary judgment, raising two issues. The trial court denied the Lawyers' motion as to one issue, but granted it as to the other. The Carlsons now appeal, raising a single issue, which we restate as whether the trial court properly granted summary judgment based on its determination that reformations to the Wills drafted by the Lawyers effectively eliminated any malpractice that occurred relating to the drafting of the original Wills. On cross-appeal, the Lawyers raise a single issue, which we restate as whether the trial court properly denied its motion for summary judgment on the grounds that the original Wills would result in adverse tax consequences. The Lawyers also raise the following issues: 1) whether the "substantial adverse interest exception" protects the Carlsons from adverse tax consequences; 2) whether the Carlsons have brought this suit too early, as the IRS has not yet assigned a tax penalty; and 3) whether the trial court improperly considered the opinion of an attorney hired by the Carlsons. We conclude the adverse interest exception does not protect the Carlsons, the Carlsons are not precluded from bringing their suit at this time, and

that the Lawyers waived their argument relating to the opinion of the expert witness by not raising it before the trial court. We further conclude that the trial court properly found that the original Wills would result in adverse tax consequences, and affirm the trial court's denial of the Lawyers' motion for summary judgment on that issue. However, we conclude that the reformations did not effectively avoid potential adverse tax consequences, reverse the trial court's grant of summary judgment on that issue, and remand for further proceedings.

### Facts and Procedural History

In 1988, Norman Sr. and Hilda retained the Lawyers to prepare their Wills. Norman and Hilda informed Sweeney that, among other things, they wished to ensure that the property passing to Norman Jr. and Margaret would not be subject to federal estate or state inheritance tax upon the deaths of Norman Jr. and Margaret. Sweeney agreed to prepare the Wills in this way. The relevant portions of Hilda's Will are: [1]

> ITEM II. I give, devise and bequeath all my personal and household effects and the like not otherwise effectively disposed of, such as jewelry, clothing, automobiles, furniture, furnishings, silver, books, pictures, and my real estate to my husband, NORMAN R. CARLSON. In the event my said husband should be deceased at such time, I direct that this bequest and devise shall lapse in favor of my son, NORMAN R. CARLSON, JR.
>
> ITEM III. All the residue of my estate and property, wherever situated, including lapsed legacies and devises, but expressly excluding any property over which I may now or hereafter have a power of appointment, I give to FIRST

CITIZENS BANK, N.A., as Trustee, to be held and disposed of as follows:

SECTION 1: If my husband survives me, then commencing with my death the Trustee shall pay the income from the trust estate in convenient installments, at least quarterly, to him during his lifetime.

The trustee may also pay to my husband such sums from principal as the Trustee deems necessary or advisable from time to time for his medical care, comfortable maintenance and welfare, considering his income from all sources known to the Trustee.

SECTION 2: Upon the death of my husband, the Trust shall continue and the Trustee may pay the income from the Trust Estate in convenient installments, at least quarterly, to my son, NORMAN R. CARLSON, JR., and to his wife, MARGARET ANN CARLSON, and the survivor of them. The Trustee may also pay to my said son, NORMAN R. CARLSON, JR., and/or his said wife, MARGARET ANN CARLSON, such sums from principal as the Trustee deems necessary or advisable from time to time for either of their medical care, comfortable maintenance and welfare, considering the income of either from all sources known to the Trustee.

Upon the death of my said son, NORMAN R. CARLSON, JR., and his wife, MARGARET ANN CARLSON, the Trustees shall distribute whatever balance remains in this Trust in equal shares to my following-named grandchildren.

BETH CARLSON AND DAVID CARLSON

* * *

---

1. Norman Sr.'s Will is identical except that his Will leaves his property first to Hilda.

(a) While any grandchild of mine is under the age of twenty-one (21) years, the Trustee shall use for his benefit so much of the income of his share of this trust as the Trustee determines to be required, in addition to his other income from all sources known to the Trustee, for his reasonable support, comfort, welfare, maintenance (including medical, surgical hospital or other institutional care) and education including post high school education adding any excess income to principal at the discretion of the Trustee. After the grandchild reaches the age of twenty-one (21) years, the Trustee shall pay all the current net income of his share of this trust to him in convenient installments at least as often as quarter-annually. The Trustee may in its discretion pay to or use for the benefit of such grandchild so much of the principal of his share of this trust as the Trustee determines to be required, in addition to his respective incomes from all other sources known to the Trustee, for his reasonable support, comfort, welfare, maintenance (including medical, surgical hospital or other institutional care) and education including post high school education, or for any other purpose the Trustee believes to be in the best interests of either of [sic] grandchild.

* * *

ITEM IV. The Trustee of the trusts herein shall have the following powers: A. If any beneficiary to whom the Trustee is directed in a preceding provision to distribute any share of trust principal is under the age of twenty-one (21) years when the distribution is to be made, and if no other trust is then to be held under this instrument for his primary benefit, his share shall vest in interest in him indefeasibly, but the Trustee may in its discretion continue to hold it as a separate trust, for such period of time as the Trustee deems advisable but not after the time the beneficiary reaches that age, in the meantime using for his benefit so much of the income and principal as the Trustee determines to be required, in addition to his other income from all sources known to the Trustee, for his reasonable support, comfort and education, and adding any excess income to principal at the discretion of the Trustee.

B. (1) If at any time any beneficiary to whom the Trustee is directed in this instrument to pay any income is under legal disability or is in the opinion of the Trustee incapable of properly managing his affairs, the Trustee may use such income for his support and comfort.

* * *

G. (2) If any Trustee at any time resigns or is unable or refuses to act or whenever a majority of the beneficiaries of the current income decide for any reason whatsoever to remove the Trustee, any person or another corporation authorized under the laws of the United States or of any state to administer trusts may be appointed as Trustee by an instrument delivered to it and signed by the beneficiaries, at the time of appointment, of a majority of the current income.

Appellant's Appendix at 57–63.

Norman Sr. died on June 24, 1992, and Hilda died shortly thereafter on August 3, 1992. Hilda's Will was admitted to probate on August 10, 1992. On January 11, 1994, Norman Jr. retained counsel in Houston, Texas, to assist with the management of the Trust. On January 13, 1994, his Texas counsel informed Norman Jr. that the language of the Will did not conform to the Treasury Regulations, and as a result, any property remaining in the Trust at the time of Norman Jr. or Marga-

ret's death would be subject to federal estate tax. Specifically, the Texas counsel felt that the Trust created a general power of appointment, because 26 C.F.R. § 20.2041–1 indicates, "[a] power to use the property for comfort, *welfare*, or happiness of the holder of the power is not limited by the requisite standard." (Emphasis added.) General powers of appointment are taxable upon the death of the power's holder. 26 U.S.C. § 2041(a)(2). On July 27, 1994, Sweeney, at the direction of the Carlsons, filed a Petition to Reform Testamentary Trust. The LaPorte Superior Court granted this motion, and ordered that Hilda's Will was reformed to read: [2]

> The Trustee may also pay to my said son, NORMAN R. CARLSON, JR. and/or his said wife, MARGARET ANN CARLSON, such sums from principal as the Trustee deems necessary from time to time for either of their health and maintenance, considering the income of either from all sources known to the Trustee.

Appellant's App. at 70.

On June 2, 1999, the Carlsons filed an action against the Lawyers alleging malpractice in the preparation of the Wills of Norman Sr. and Hilda. The Lawyers filed a motion for summary judgment, and the Carlsons filed a Brief and Designation of Issues and Evidence in Opposition to Lawyers' Motion for Summary Judgment. The trial court held a hearing on the motion on March 3, 2000, and took the matter under advisement. The original trial court never ruled on this motion, and on October 4, 2002, the Lawyers moved to withdraw the submission under Indiana Trial Rule 53.1 for failure to rule on the motion. The Honorable Robert W. Gilmore was appointed Special Judge, and he heard oral argument on the Lawyers' motion on May 19, 2005. The trial court, sua sponte, held an additional hearing via telephone on September 6, 2005. The trial court issued an Order granting the Lawyers' motion for summary judgment on September 21, 2005. The Carlsons filed a Motion to Certify Under Trial Rule 54(B) and Stay, and the trial court issued an Order certifying the matter for interlocutory appeal on January 26, 2006. The Carlsons then moved for the trial court to reconsider the January 26 Order, and requested that the trial court certify its September 21 Order under Trial Rule 54(B). The trial court granted the Carlsons' motion to reconsider on February 9, 2006. The Carlsons now appeal.

### Discussion and Decision

■ The interpretation of a will or trust document is a pure question of law to be decided by the court. *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 531 (Ind. 2006). Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. *Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 446 (Ind.Ct.App.2005). However, we review a trial court's grant of summary judgment de novo, construing all facts and making all reasonable inferences from the facts in favor of the non-moving party. *Progressive Ins. Co. v. Bullock*, 841 N.E.2d 238, 240 (Ind.Ct.App.2006), *trans. denied*. We may affirm the trial court's grant of summary judgment upon any basis that the record supports. *Rodriguez*, 824 N.E.2d at 446.

### I. The Original Wills

For the purposes of federal estate tax, the deceased's estate includes the value of

---

**2.** The Laporte Superior Court reformed Norman Sr.'s Will in the same manner.

property over which the decedent held a general power of appointment at the time of his or her death. 26 U.S.C. § 2041. A general power of appointment is "a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate." *Id.* at (b)(1). However, "[a] power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment." *Id.* at (b)(1)(A).

Upon the death of either Norman Jr. or Margaret, the survivor will be the sole beneficiary under the Trust. As such, the survivor would have the ability to unilaterally name him or herself Trustee under the provision of the Wills allowing a majority of the beneficiaries to vote to remove the current Trustee and replace it with "any person," including the beneficiary. Thus, upon the death of either Norman Jr. or Margaret, for all practical purposes, the survivor will hold the power to invade the Trust's corpus for his or her benefit. This power will potentially be considered a general power of appointment for federal estate tax purposes.

■ The Lawyers argue that the language in the original Wills indicating that the Trustee may pay "such sums from principal as the Trustee deems necessary or advisable from time to time for either of their medical care, comfortable maintenance and welfare, considering the income of either from all sources known to the Trustee," creates an ascertainable standard, and that therefore, a general power of appointment would not exist.[3] We disagree.

■ "State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed." *Morgan v. Comm'r,* 309 U.S. 78, 80, 60 S.Ct. 424, 84 L.Ed. 585 (1940). Therefore, we must determine whether, under Indiana law, the language of the original Wills created a general power of appointment for federal estate tax purposes. *See Finlay v. United States,* 752 F.2d 246, 249 (6th Cir.1985); *First Virginia Bank v. United States,* 490 F.2d 532, 534 (4th Cir.1974). That is, we must determine whether, under the original Wills, Norman Jr. and Margaret's ability to invade the corpus was limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent. *See Finlay,* 752 F.2d at 249, *First Virginia Bank,* 490 F.2d at 534; *Lehman v. United States,* 448 F.2d 1318, 1319–20 (5th Cir.1971) ("[I]f the practical exercise of her powers of disposition and control of her own benefit was not confined within limitations at least as stringent as those prescribed by Federal law, she enjoyed a general power of appointment for Federal estate tax purposes regardless of the label attached to her interest by State courts.")

According to the Treasury Regulations, "[a] power is limited by such [an ascertainable] standard if the extent of the holder's duty to exercise and not to exercise the power is reasonably measurable in terms of his needs for health, education, or support (or any combination of them)." 26 C.F.R. 20.2041–1(c)(2). "[T]he words 'support' and 'maintenance' are synonymous and their meaning is not limited to the bare necessities of life." *Id.* "A power to

---

**3.** Apparently, the Lawyers asked the IRS for a ruling on this issue, but when the IRS indicated that it was going to issue a ruling unfavorable to the Lawyers indicating that the original Wills did not put forth an ascertainable standard, they withdrew their request. Transcript at 36.

use property for the comfort, welfare, or happiness of the holder is not limited by the requisite standard." *Id.* However, although the Treasury Regulations are certainly indicative of whether certain language creates an ascertainable standard, the failure of the original Wills to comply precisely with these regulations does not automatically render the standard not ascertainable. *See Estate of Sieber v. Oklahoma Tax Comm'n,* 41 P.3d 1038, 1045 (Okla.Civ.App.2001), *cert. denied* (noting that in the federal cases examining this issue, "the federal courts declined to perform a rote comparison of the trust language to ascertain whether the language mimicked word for word the statute or regulation.").

As far as we have been able to determine, what constitutes an ascertainable standard relating to one's health, education, support, and maintenance is an issue of first impression in Indiana. In addressing this question, we look to Indiana's general rules of construction for testamentary trusts, and cases determining a beneficiary or trustee's ability to invade a trust's corpus. *See Finlay,* 752 F.2d at 249 (in absence of explicit decision rendered by Tennessee supreme court, federal court looked to court of appeals case interpreting an heir's rights under will provision leaving property "to be used as she see fit, as long as she lives"); *Estate of Jones v. Comm'r,* 56 T.C. 35, 40 (1971) (examining New Jersey law relating to the interpretation of wills).

1. Interpretation of Settlor's Purpose
Based on Language of the
Document

■■■ The primary goal when interpreting a testamentary trust is to determine the testator's intent. *Retseck v. Fowler State Bank,* 782 N.E.2d 1022, 1025 (Ind.Ct.App.2003). We will examine the document in its entirety to determine the settlor's purpose as it appears within the document's four corners. *In re Stonecipher,* 849 N.E.2d 1191, 1195 (Ind.Ct.App. 2006); *see Baker,* 843 N.E.2d at 535 n. 2 (recognizing that although the Restatement Third of Property: Wills & Other Donative Transfers rejects the four-corners rule, Indiana still follows the rule). We will look first to the language used by the settlor in the document, and if we conclude the terms are unambiguous, we will not look to extrinsic evidence. *Goodwine v. Goodwine,* 819 N.E.2d 824, 829 (Ind.Ct.App.2004). "It is a well-established rule of law that the words in a will are to be understood to have been used by the testator in the common and ordinary sense, and no word can be rejected and another substituted in its place without the clearest certainty that such was the intention of the testator." *Mundhenk v. Bierie,* 81 Ind.App. 85, 135 N.E. 493, 494 (1922). If we conclude that ambiguity, either patent or latent, exists, we may then turn to extrinsic evidence. *Baker,* 843 N.E.2d at 535 (abolishing the distinction between patent and latent ambiguities for the purposes of examining extrinsic evidence when interpreting a trust document).

The common meaning of "welfare" is "[h]ealth, happiness, and good fortune," "wellbeing," "prosperity," The American Heritage Dictionary of the English Language 1952 (4th ed.2000), or "[w]ell-being in any respect; prosperity," Black's Law Dictionary 1625 (8th ed.2004). This common usage indicates that the term "welfare" has wide connotation and is not a term generally indicative of an intent to delineate ascertainable limits relating to one's health, education, support, or maintenance. *Cf. Long v. Bd. of Zoning Appeals for City of Indianapolis,* 134 Ind.App. 97, 182 N.E.2d 790, 792–93 (1962) (interpreting an ordinance requiring that for an exception to be granted the proposed use

must serve the public welfare and noting that "the term 'public welfare' cannot be precisely defined"). However, as we interpret testamentary documents as a whole, we must examine the term "welfare" within the context of the Wills.

The Wills contain four clauses identifying the relevant level of discretion afforded to the Trustee when distributing income or principal. The Trustee may distribute principal to Norman Jr. or Margaret "as the Trustee deems necessary or advisable ... for his medical care, comfortable maintenance and welfare, considering his income from all sources known to the Trustee." Appellant's App. at 58. If the beneficiary is a grandchild under the age of 21, the Trustee shall distribute income "as the Trustee determines to be required, in addition to his other income ... for his reasonable support, comfort, welfare, maintenance (including medical, surgical hospital or other institutional care) and education." *Id.* at 59. If the beneficiary requesting a distribution of principal is under the age of 21, the Trustee may "in its discretion hold it as a separate trust ... using for [the beneficiary's] benefit so much of the income and principal as the Trustee determines to be required, in addition to his other income ... for his reasonable support, comfort and education." *Id.* at 60. If the beneficiary entitled to income is "under legal disability or is in the opinion of the Trustee incapable of properly managing his affairs, the Trustee may use such income for his support and comfort." *Id.* It is apparent from the different standards that Norman Sr. and Hilda intended to entitle Norman Jr. and Margaret to far more liberal distributions of principal than other beneficiaries, and that the term "welfare" is not limited to uses related solely to health, education, support, or maintenance.

As the Trustee may distribute principal to Norman Jr. or Margaret for uses related to medical care, comfortable support and welfare, the term "welfare" must mean something in addition to medical care and comfortable support. *Cf. Stowers v. Norwest Bank Indiana, N.A.,* 624 N.E.2d 485, 490 (Ind.Ct.App.1993), *trans. denied* ("This Court cannot vary or delete terms used in the instrument."). Other clauses in the Wills also indicate that Norman Sr. and Hilda thought of "welfare" as ·encompassing more than medical care, support, maintenance, and education. The clause relating to distributions of income to grandchildren indicates that the Trustee may distribute income "for reasonable support, comfort, welfare, maintenance (including medical, surgical hospital or other institutional care) and education." Appellant's App. at 59. If the testators thought the term "welfare" was encompassed by medical care, support, maintenance, and education, it would have been unnecessary for them to include the term. Again, as we are not at liberty to merely ignore the term, it must have some additional meaning. Finally, the testators, when dealing with distributions of principal to beneficiaries under the age of 21, or distributions of income to incapacitated beneficiaries, did not allow the Trustee to make distributions for the beneficiaries' "welfare," and limited distributions to support, comfort, and, for those under 21, education. This distinction also indicates that the testators intended that Norman Jr. and Margaret have access to the Trust's principal for reasons beyond health, support, and maintenance.

We conclude that the language of the trust as a whole unambiguously indicates that Norman Sr. and Hilda intended that the term "welfare" encompass more than support, maintenance, medical care, and education.

We also note that the Wills indicate that the Trustee may make distributions to Norman Jr. and Margaret only if the Trustee deems the distributions "necessary" or "advisable." The common meaning of "advisable" is "[w]orthy of being recommended or suggested; prudent." The American Heritage Dictionary of the English Language 25. This common meaning indicates that the testators intended that the Trustee enjoy considerable latitude in determining when to make distributions of principal to Norman Jr. or Margaret. Also, the Wills direct that the Trustee may make distributions to beneficiaries under the age of 21 only when the Trustee finds that the distributions are "required." This grant of additional latitude when making distributions to Norman Jr. and Margaret provides further evidence that Norman Sr. and Hilda intended that Norman Jr. and Margaret be allowed to invade the trust's corpus for a variety of purposes not limited by an ascertainable standard. *See Forsee v. United States,* 76 F.Supp.2d 1135, 1139–40 (D.Kan.1999) (distinguishing language allowing a trustee to make distributions he "deems advisable" from allowing only those distributions the trustee deems "required," and concluding that the language "deems advisable" does not limit invasion of a trust's corpus to an ascertainable standard).

### 2. Indiana Case Law Relating to Power to Invade the Corpus

Although no Indiana case explicitly addresses whether a document creates an ascertainable standard for distributions of a trust's corpus, our case law indicates that Indiana Trustees are liberally allowed to distribute trust principal. Our case law addressing a life estate holder's ability to invade the property is also relevant by analogy because a Trustee has a duty to all beneficiaries similar to the duty owed by the holder of a life estate to remaindermen. *See Finlay,* 752 F.2d at 248; *Best v.*

*United States,* 902 F.Supp. 1023, 1025 (D.Neb.1995).

■ In Indiana, "where a trustee determines that it is necessary and proper to use trust assets for a certain purpose, we will not interfere unless the trustee acted in bad faith or in some way abused or unreasonably exercised his discretion." *In re Stonecipher,* 849 N.E.2d at 1195. As discussed above, the fact that the Trustee may make distributions he deems "advisable" indicates that Norman Sr. and Hilda intended that this discretion be broad.

In *John v. Bradbury,* 97 Ind. 263, 1884 WL 5418 at * 1, our supreme court addressed a will containing the following provision:

> I give and bequeath to my wife, Mary C. Newport, my property, both personal and real, to hold and possess, sell, use and dispose of as she may see fit, for her own comfort and convenience, and hereby empower her to sell what realty I may be in possession of at my death, and convey the same by deed in fee simple, if her necessities or comfort require it.

Our supreme court held that this provision gave the testator's widow "only a life-estate, with power to dispose of the property *absolutely,* for her own comfort and convenience." *Id.* at *2 (emphasis added). Although the term "convenience" may be broader than "welfare," *Bradbury* demonstrates the liberal interpretation of language limiting one's power to dispose of life estate property. *Cf. Sims v. Ratcliff,* 62 Ind.App. 184, 110 N.E. 122, 124 (1915) (where testator gave all his personal property to his wife "to have the use and enjoy the same for her support and maintenance, and to sell and dispose of said property for that purpose," and suggested that remaining property go to his children, the testa-

tor gave his personal property to his widow "absolutely" and recommendation was not binding).

*Robison v. Elston Bank & Trust Co.,* 113 Ind.App. 633, 48 N.E.2d 181, 183 (1943), addressed a trust providing that if one of the beneficiaries "should be stricken by some serious illness or disease, or overtaken by some accident, misfortune or disaster," the trustee may disburse funds from the trust's principal "if in the judgment of the said trustee the same is proper and reasonably required for his or her welfare and proper care." We interpreted this clause to justify the trustee's expenditure of funds from the principal for economic, as well as medical disasters, and found that the trustee did not abuse his discretion in disbursing funds to enable a beneficiary to move to California, on the advice of a physician, and raise avocados. *Id.* at 188. We also rejected the argument that the trustee had abused his discretion by expending part of the principal for the advantage of the beneficiary's family, stating "[t]he needs of a married man include not only needs personal to him, but also the needs of his family living with him and entitled to his support. It would not be consistent with his welfare for his family to be in want." *Id.* at 189. *Robison* demonstrates the variety of uses encompassed by the term "welfare" and indicates that Norman Jr. and Margaret's welfare also includes the welfare of their children.

*Rinkenberger v. Meyer,* 155 Ind. 152, 56 N.E. 913, 913 (1900), addressed a trust in which the testator left all his property to his wife, and directed that his wife "have a right to use and expend so much of the said property as shall be needful for her support; that she may sell [certain real estate] if she desires to do so; and what of my property is left at her decease shall go to [her niece]." The court examined the circumstances surrounding the execution of the will and concluded: "We think it apparent from the will that the testator intended to confer upon his wife the power to sell and convey any portion or all of his estate, if she desired." *Id.* Although the plaintiff in *Rinkenberger* had failed to preserve the issue of whether the trial court had properly excluded testimony as to whether the sale of the property had been necessary for the wife's support, *id.* at 914, the language used by the *Rinkenberger* court indicates that the court interpreted the will to give the wife wide discretion to use and dispose of the property.

These decisions indicate the broad approach taken by Indiana courts in interpreting clauses similar to the one at issue in this case. They indicate that the Trustee here would be allowed under Indiana law to invade the corpus for a variety of reasons not limited to medical care, support, maintenance, or education. Because the Trustee would be so allowed, we conclude that the Wills' language did not create an ascertainable standard for purposes of federal estate tax. *See Lehman,* 448 F.2d at 1320; cf. *Finlay,* 752 F.2d at 249 (where Tennessee law would not allow beneficiary to invade corpus beyond what was needed for support and maintenance, there was an ascertainable standard).

Based on the intent of Norman Sr. and Hilda, as expressed in their Wills, and on Indiana case law providing Trustees with considerable latitude to invade the corpus when charged with trusts using language similar to that in this case, we conclude that the original Wills created a general power of appointment for the purpose of 26 U.S.C. § 2041.

## II. The Reformed Wills [4]

### A. Effect of Reformation on the IRS and Federal Courts

■ The trial court granted summary judgment on the basis that the language in the reformed Wills creates an ascertainable standard for federal estate tax purposes, that the IRS must accept these reformations, and that therefore the Lawyers did not commit malpractice.[5] We conclude that the IRS is not bound by the Laporte Superior Court's reformation of the Wills, and that the trial court improperly granted summary judgment on this issue.

■ The clear rule with regard to state trial court decisions is that "when the application of a federal statute is involved, the decision of a state trial court as to an underlying issue of state law should a fortiori not be controlling." *Comm'r v. Bosch's Estate*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In *Estate of Kraus v. Comm'r*, 875 F.2d 597 (7th Cir. 1989), the testator's estate successfully petitioned an Illinois state court to reform the trust in an attempt to avoid a tax assessment. The Seventh Circuit stated: "A lower state court's reformation, however, is not binding on the Tax Court because only the state's highest court can make a ruling on state law that binds the federal courts." *Id.* at 600; *see also, Van Den Wymelenberg v. United States*, 397 F.2d 443, 445 (7th Cir.1968), *cert. denied*, 393 U.S. 953, 89 S.Ct. 377, 21 L.Ed.2d 364 (1968) ("[N]ot even judicial reformation can operate to change the federal tax consequences of a completed transaction"); *Harris v. Comm'r*, 461 F.2d 554, 556 n. 2 (5th Cir.1972) (citing *Van Den Wymelenberg*); *Emerson Institute v. United States*, 356 F.2d 824, 826 (D.C.Cir.1966), *cert. denied*, 385 U.S. 822, 87 S.Ct. 49, 17 L.Ed.2d 59 (1966) ("The law appears well established that a nunc pro tunc decree in

**4.** We note that at the trial court level, the Lawyers argued that if the Carlsons "truly believe that any alleged general power of appointment they possessed was not effectively extinguished in the reformation proceedings, all they need do is formally release the broader power," and that "they are free to eliminate the tax problem by formally releasing the pre-reformation standard down to the post-reformation standard." Appellant's App. at 116. The Lawyers also provided a sample release form. *Id.* at 118. Although the Lawyers do not make this argument on appeal, we wish to point out why this course of action would not work.

Under Indiana Code section 32–17–6–2, the holder of a power of appointment "may execute an appropriate written instrument to, in whole or in part ... renounce the person's right of appointment." The Lawyers correctly argued that an irrevocable release would result in the IRS not assessing a tax under 26 U.S.C. § 2041, as neither Norman Jr. or Margaret could hold the power of appointment at their death. However, such a release would be taxed as a transfer of property. 26 U.S.C. §§ 2501 ("A tax ... is hereby imposed ... on

the transfer of property by gift"), 2514(b) ("The exercise or release of a general power of appointment ... shall be deemed a transfer of property"); *Jewett v. Comm'r*, 455 U.S. 305, 306, 102 S.Ct. 1082, 71 L.Ed.2d 170 (1982) ("A trust beneficiary's refusal to accept ownership of property may constitute an indirect gift to a successor in interest subject to federal gift tax liability"). This tax could have been avoided had Norman Jr. and Margaret released the power within nine months of Norman Sr.'s death, 26 U.S.C. § 2518(b)(2), but by the time the Carlsons discovered the defect in the Wills, this period had passed. The fact that such a release would have been taxed explains why the Carlsons did not pursue this avenue, and puts the attempt to reform the Wills in context, making the course appear to be an end-run around the tax imposed upon a release made outside of the nine-month period.

**5.** The Carlsons have not argued that they are entitled to damages based on any negligence that necessitated these reformations, and do not argue that the language of the reformed Wills does not create an ascertainable standard.

proceedings to which the Internal Revenue Service is not a party is not binding on that Service for tax purposes."); *Piel v. Comm'r,* 340 F.2d 887, 891 (2nd Cir.1965) ("[R]etroactive judgments of state courts cannot thus affect the rights of the federal government under its tax laws."); *Estate of Preisser v. Comm'r,* 90 T.C. 767, 769 (1988) ("[W]e are not bound by the construction given to decedent's will by the Kansas State District court as that court is not the Supreme Court of Kansas"). *But see, Flitcroft v. Comm'r,* 328 F.2d 449, 459 (9th Cir.1964) (reformation of trust bound IRS where IRS had notice of the proceeding and there was no evidence that the proceeding was collusive). Therefore, the mere fact that the LaPorte Superior Court reformed the Wills does not mean that the IRS or a reviewing federal court would be bound by that reformation.[6]

■ When a federal court is faced with a decision made by a state court other than that of the state supreme court, it "must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court." *Bosch,* 387 U.S. at 465, 87 S.Ct. 1776. Therefore, we must determine whether the reformation ordered by the LaPorte Superior Court was in accordance with Indiana law.

### B. Analysis of the Reformations Under Indiana Law

■ The LaPorte Superior Court reformed the Wills based on the following relevant findings:

9. That the reformation of the trust to prevent any beneficiary as Trustee from exercising, for his own benefit the discretionary power of distribution authorizing invasion of principal not limited by an ascertainable standard would be in the best interest of his children who are the remaindermen.

10. That the interest of the Testatrix, Hilda D. Carlson, was to preserve the principal of the Trust for distribution to her grandchildren except for invasion of principal by the Trustee pursuant to an ascertainable standard.

11. That to subject the balance in the trust at the death of Norman R. Carlson, Jr. and Margaret A. Carlson under the existing standard of invasion could result in payment of death taxes, unnecessarily shrinking the amount that is passed on to the grandchildren, thereby substantially impairing the accomplishment of the purpose of the trust.

* * *

13. That I.C. 30–4–3–26 permits the Court "to direct or permit a Trustee to deviate from a term of the trust if owing to circumstances not known to the Settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purpose of the Trust."

* * *

16. That ... Norman R. Carlson [Sr.] ... and Hilda D. Carlson ... each intended that the principal of their trust not be taxed again at the deaths of [Norman Jr. and Margaret].

Appellant's App. at 69–70. We conclude that the reformation of the Wills was contrary to Indiana law.

---

**6.** Although not binding precedent, we also note that the IRS issued a private letter ruling indicating that the trust instrument at issue did not limit the Trustee to an ascertainable standard, and that "a state trial court order reforming or rescinding the trust would not bind either the Service or any court reviewing the matter." I.R.S. Priv. Ltr. Rul. 89–12–014, 1989 WL 594772 (March 24, 1989).

A trial court may reform a trust "according to the same general rules applying to rescission or reformation of non-trust transfers of property." Ind. Code § 30–4–3–25. Therefore, a reviewing court is not "at liberty to rewrite the trust agreement any more than it is at liberty to rewrite contracts." *Colbo v. Buyer*, 235 Ind. 518, 525, 134 N.E.2d 45, 49 (1956). "Reformation is 'an extreme equitable remedy to relieve the parties of mutual mistake or of fraud.' " *Meyer v. Marine Builders, Inc.*, 797 N.E.2d 760, 772 (Ind.Ct.App.2003). "Where, however, the language of the will itself does not furnish evidence of a mistake, a court cannot interfere upon the ground that a mistake was made by the testator." *Pocock v. Reddinger*, 108 Ind. 573, 9 N.E. 473, 473 (1886). The party seeking reformation must show either mutual mistake or fraud, as well as the original intent of the parties by clear and convincing evidence. *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 160 (Ind.1994). However, this mistake must be one of fact, not one of law. *Hudson v. Davis*, 797 N.E.2d 277, 284 (Ind.Ct.App.2003), *trans. denied.* "A mistake of law, a mistake as to the legal import of language used, will not normally support a claim for reformation of an instrument." *Peterson v. First State Bank*, 737 N.E.2d 1226, 1229 (Ind.Ct.App.2000). Therefore, where parties are not mistaken about the actual terms used, but merely about the legal effect of those terms, reformation is not a proper remedy. *See Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1276 (Ind.Ct.App.2001). When the mistake does not consist of "inserting . . . a form of words not intended, or in omitting therefrom a form of words intended to be inserted," but instead "consists in the misinterpretation of the legal effect of the expression used," the mistake is one of law. *Shoe v. Heckley*, 78 Ind. App. 586, 134 N.E. 214, 216 (1922).

The LaPorte Superior Court's findings indicate that the mistake in drafting the Wills was one of law. There is no claim that the term "welfare" was mistakenly inserted; the claim is that the term "welfare" mistakenly had the effect of creating an unascertainable standard. Such a mistake of law does not warrant reformation.

Also, the LaPorte Superior Court's findings indicate that it focused on Norman Sr. and Hilda's intent that the trust not be taxed upon the death of Norman Jr. and Margaret. Although the testators may have wished to avoid federal estate taxes, this intent or purpose was clearly secondary to their intent or purpose to supply for the wants and needs of Norman Jr. and Margaret. Had the primary intent of the testators been to avoid taxes, they would have established a charitable trust that would not be taxed under 26 U.S.C. § § 642(c), 170(c). Had the testator's primary intent or purpose been to benefit their grandchildren, they would have not set up the trust so as to make Norman Jr. and Margaret the primary beneficiaries. The testators may have desired that their trust be taxed as little as possible, but this goal was clearly secondary to their intent to provide for Norman Jr. and Margaret. It is a well-established rule that "a general intent in a will is to be carried into effect at the expense of any particular intent," and that "when there are conflicting intents, that which is the most important must prevail." *Fowler v. Duhme*, 143 Ind. 248, 42 N.E. 623, 626 (1896) (citations omitted). Here, the general, and most important intent of the Trust was to provide for Norman Jr. and Margaret, and the specific intent to avoid federal estate taxes cannot be a reason to deviate from the Trust's terms.

Under Indiana law, the reformation of the Wills by the LaPorte County Court

was improper. A federal court sitting as an Indiana state court would therefore not acknowledge the reformations, and would use the original Wills when determining the Trust's tax liability.

### C. The Adverse Interest Clause

██ A power of appointment is not considered a general power of appointment for federal estate tax purposes "[i]f the power is not exercisable by the decedent except in conjunction with a person having a substantial interest in the property, subject to the power, which is adverse to exercise of the power in favor of the decedent." 26 U.S.C. § 2041(b)(1)(C)(ii). The Lawyers claim that the interests of Norman Jr. and Margaret are adverse,[7] and that therefore, this exception applies. The fundamental flaw in this argument is that the Carlsons are not claiming that either Norman Jr. or Margaret currently holds a general power of appointment. However, upon the death of either Norman Jr. or Margaret, the other will be the sole beneficiary, and as such, has the power to appoint him or herself trustee. At that point, either Norman Jr. or Margaret would be the sole trustee and the sole beneficiary. There would be no other party holding an adverse interest with whom the trustee-beneficiary would need to exercise the power. Regardless of whether the adverse interest exception precludes either Norman Jr. or Margaret from currently holding a general power of appointment, the exception clearly does not prevent either from holding a general power of appointment at death, the critical point for tax purposes.

We conclude that the IRS or a federal court would not recognize the reformations to the Wills, as the reformations were not properly granted under Indiana law. Therefore, we must reverse the trial court's grant of the Lawyers' motion for summary judgment, and remand for further proceedings.

### III. Timeliness of the Suit

The Lawyers also argue that, even assuming their handling of the Wills fell below the requisite standard of care, the Carlsons cannot demonstrate damages, and that therefore, we must affirm the trial court's grant of summary judgment. This argument consists of two positions: 1) if Norman Jr. and Margaret die simultaneously, the adverse holder rule would have prevented either from holding a power of appointment, thereby leading to no adverse tax consequences from any negligence on the Lawyers' part; and 2) any prediction of the IRS's future tax assessment is speculative, and cannot form the basis for a finding of damages. Were we in another state, Kentucky for example, the Lawyers' claim would have merit.[8] However, under Indiana law, the Carlsons did not bring this suit too early; they brought it too late.

██ The statute of limitations for a claim stemming from legal malpractice is two years. *Estate of Spry v. Batey*, 804 N.E.2d 250, 252 (Ind.Ct.App.2004), *trans. denied*; Ind.Code § 34-11-2-3. These causes of action are subject to the "discovery rule," under which the statute of limitations begins to run when the plaintiff knows or should have discovered using ordinary diligence, that an injury has occurred due to his or her attorney's tortuous act. *Batey*, 804 N.E.2d at 253. For a legal malpractice action to accrue, "it is not necessary that the full extent of damage be known or even ascertainable, but only

---

7. We make no statement as to whether the interests of a husband and wife are "adverse" for purposes of this statute.

8. *See Pedigo v. Breen*, 169 S.W.3d 831, 833 (Ky.2004) ("A professional negligence claim does not accrue until there has been a negligent act and until reasonably ascertainable damages are incurred.").

that some ascertainable damage has occurred." *Id.* (quoting *Keep v. Noble County Dept. of Pub. Welfare*, 696 N.E.2d 422, 425 (Ind.Ct.App.1998), *trans. denied* ). "A legal malpractice plaintiff normally need not exhaust all possible remedies as a condition precedent to bringing the malpractice suit." *Godby v. Whitehead*, 837 N.E.2d 146, 150 (Ind.Ct.App.2005), *trans. denied.* Our supreme court has explained, in the context of legal malpractice relating to the drafting of a will:

> When did damage to Plaintiff result from Defendant's alleged negligence? Not when the Will was drafted or executed, because it had to await the death of [the testator] before it could have any dispositive effect. But at his death, the instrument was operative; and ... the wrong, if any, set in motion with the drafting of [the testator's] Will became irremediable with his death.

*Shideler v. Dwyer*, 275 Ind. 270, 285, 417 N.E.2d 281, 290 (1981). The court went on to explain:

> The issue in [the] action here is not whether or not the will clause is valid but whether or not it was inartfully conceived and drafted by the defendants, in violation of a standard of care owing.
> * * *
> To be sure, the ultimate effect upon the plaintiff of the defendant's alleged negligence was speculative at the time the cause of action accrued, but it cannot be questioned that the impact occurred at the time of [the testator's] death.... Whether or not the will was competently drawn was the issue to be tried in the court below. Whether or not the clause was ultimately held to be valid or invalid

would weigh heavily on that issue, but it would not determine it.

*Id.*

■■■ We conclude that our supreme court's holding in *Shideler* is controlling. Although the IRS could conceivably conclude that a general power of appointment does not exist,[9] although we may not be able to determine the tax effects of the IRS concluding a general power of appointment does exist, and although Norman Jr. and Margaret could conceivably die simultaneously,[10] if the Lawyers drafted Wills in a manner that did not conform to the requisite standard of care, the Carlsons had a viable claim at the point of Hilda's death. The Carlsons were not only allowed to bring their claim at that point, they were required to do so within two years of learning of the alleged negligence. Therefore, the latest point to which the statute of limitations could possibly have been tolled was when the Carlsons' Texas attorneys informed them of the allegedly defective language.[11]

■■■ The Carlsons filed their claim on June 2, 1999, roughly five years after their Texas attorneys informed them of the Wills' defective language. Although the Carlsons filed their claim after the statute of limitations had run, the Lawyers have waived this affirmative defense by failing to include it in the pleadings. Ind. Trial Rule 8(C); *Sullivan Builders & Design, Inc. v. Home Lumber of New Haven, Inc.*, 834 N.E.2d 129, 136 (Ind.Ct.App.2005), *trans. denied; Madison Area Educ. Special Serv. Unit v. Daniels by Daniels*, 678 N.E.2d 427, 430 (Ind.Ct.App.1997), *trans. denied* (party waived affirmative defense of statute of limitations by failing to raise

---

9. As discussed above, the IRS likely will conclude that such a power exists.

10. We express serious doubt as to whether so improbable an occurrence could ever render damages impermissibly speculative.

11. We express no opinion as to whether the statute of limitations began to run at this point or at the point of Hilda's death, as such a determination is not necessary to our opinion.

it until after trial court had ruled on summary judgment motion).

■ We recognize the problems inherent with allowing claims to proceed where the extent of damages is uncertain,[12] and in all likelihood will not be ascertainable until the IRS assesses taxes on the estate of the later to die of Norman Jr. and Margaret. *See, e.g., Pedigo,* 169 S.W.3d at 834; *Kennedy v. Goffstein,* 62 Mass.App. Ct. 230, 815 N.E.2d 646, 650 (2004). However, to disallow suits until the IRS has assessed tax liability leads to other problems especially apparent in the case of negligently drafted trust documents on which the IRS will not assess taxes until the death of relatively young beneficiaries. This later approach "essentially permits lawsuits on the basis of an attorney's negligence for an indefinite period of time," and "does nothing to further the goals of prompt presentation of claims or seasonable notice to defendants." *Godby,* 837 N.E.2d at 151 (quoting *Silvers v. Brodeur,* 682 N.E.2d 811, 817 (Ind.Ct.App.1997), *trans. denied* ) (discussing the rationale for allowing criminal defendants to bring malpractice claims against their attorneys before being exonerated or receiving other relief from conviction). Courts face a "Catch-22" when deciding whether to allow claims such as the one here to proceed before the IRS actually makes its tax assessment. Our supreme court has chosen to allow claims to proceed before the assessment while damages may not be definitely ascertainable. Therefore the Carlsons' suit is not premature for lack of ascertainable damages.

IV.   Admissibility of Expert Opinion [13]

■ The Lawyers argue that the Expert Witness Report of Professor Stanley M. Johanson is "irrelevant and inadmissible" as a legal opinion under Indiana Evidence Rule 704(b). Appellee's Br. at 15. However, we have found no indication in the record that the Lawyers filed a motion to strike Professor Johanson's Report. Therefore, the Lawyers have waived this issue. *Legacy Healthcare, Inc. v. Barnes & Thornburg,* 837 N.E.2d 619, 640 (Ind.Ct. App.2005), *trans. denied; American Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 429 n. 2 (Ind.Ct.App.1996) (noting that party waives argument regarding issue of admissibility of affidavit designated on motion for summary judgment by failing to file a motion to strike or raising another objection).

■ Waiver notwithstanding, we note our agreement with the Lawyers that trial courts should not consider statements by lawyers concerning legal issues. *Walker v. Lawson,* 526 N.E.2d 968, 970 (Ind. 1988) (presence of affidavits containing

---

**12.** Although the Lawyers seem to argue at points that if the IRS does not assess tax liability, the Carlsons have no cognizable claim for malpractice, we note that this argument fails, as the Carlsons have already expended time and money dealing with the Wills; if the Lawyers' work with regard to the Wills is determined to be negligent, these costs may be considered damages flowing from the Wills regardless of whether the IRS assesses a tax penalty. *See Shideler,* 275 Ind. at 285, 417 N.E.2d at 290 (ultimate validity of clause in will would be important, but not conclusive factor, as to attorney's liability); *Knight v. Furlow,* 553 A.2d 1232 (D.C.1989) ("A lawyer's negligence in drafting a will can result in litigation over the will which, though ultimately successful for the client, could have been avoided by adherence to a proper standard of care.").

**13.** We note that in support of its argument on this point, the Lawyers cite *Vaughn v. Daniels Co. (West Virginia), Inc.,* 777 N.E.2d 1110, 1122–23 (Ind.Ct.App.2002). Our supreme court granted transfer in *Vaughn,* and vacated the opinion. *Vaughn v. Daniels Co. (West Virginia), Inc.,* 841 N.E.2d 1133 (Ind.2006). We encourage counsel to ensure that it does not cite cases that have been vacated without so indicating.

lawyers' interpretations of the law did not create an issue of material fact); Ind. Evid. Rule 704(b) ("Witnesses may not testify to opinions concerning ... legal conclusions."). However, in order "to prove legal malpractice, expert testimony is normally required to demonstrate the standard of care by which an attorney's conduct is measured." *Indianapolis Podiatry, P.C., v. Efroymson,* 720 N.E.2d 376, 383 (Ind.Ct.App.1999), *trans. denied.* Therefore, to the extent that Professor Johanson's Report discusses the standard of care expected of an attorney, it is admissible and relevant.[14]

### Conclusion

We conclude that the trial court properly determined that the original Wills did not establish an ascertainable standard regarding a Trustee's ability to invade the trust corpus; that the "adverse interest" clause does not protect the Trust from tax liability; and that the Carlsons did not bring this suit prematurely. Therefore, we affirm the trial court's denial of the summary judgment motion on these grounds. We also conclude that the reformations did not comport with Indiana law, and that the trial court therefore improperly granted summary judgment. We therefore reverse the trial courts grant of summary judgment and remand for further proceedings.

Affirmed in part, reversed in part, and remanded.

BAKER, C.J., and DARDEN, J., concur.

---

14. We do not determine what parts of Professor Johanson's Report constitute legal opinions that would be inadmissible under Indiana Evidence Rule 704(b). We note that our opinion here decides many of the legal issues addressed by Professor Johanson, and therefore, his Report in regard to these issues will not need to be considered on remand.